**INTERNATIONAL MINERALS AND CHEMICAL CORPORATION, Plaintiff-Appellee,**

v.

**HUSKY OIL COMPANY, Defendant-Appellant.**

**No. 72–1191.**

United States Court of Appeals, Seventh Circuit.

Argued March 2, 1973.

Decided Sept. 27, 1973.

Rehearing Denied Oct. 18, 1973.

George V. Bobrinskoy, Jr., Chicago, Ill., for defendant-appellant.

Henry A. Preston, Chicago, Ill., for plaintiff-appellee.

Before FAIRCHILD, STEVENS and SPRECHER, Circuit Judges.

SPRECHER, Circuit Judge.

This diversity case raises the question of whether interest became due and payable on a loan. The parties, despite able counsel, have managed to balance the affirmative and negative factors in almost perfect equipoise.

Husky Oil Company appeals from a judgment holding it liable for interest in the amount of $115,000, plus interest on that sum, due on two promissory notes given by Husky to International Minerals and Chemical Corporation (IMC) in 1967 and 1968.

## I

The facts as found by the district court are as follows: IMC is a New York corporation engaged in the discovery, extraction and sale of various minerals and chemicals for industrial and consumer use. Husky is a Delaware corporation whose business is the production, refining and marketing of oil, gas and oil products. In 1956, Husky acquired ownership of leaseholds in Idaho containing extensive bodies of phosphate ore.

On October 20, 1961, IMC and Husky entered into an agreement under which Husky would receive a $3,000,000 interest-free loan from IMC, to be repaid December 15, 1966 unless the agreement was terminated earlier. In return, IMC would be allowed to explore the phosphate leaseholds in order to determine whether a profitable mining operation was feasible. If the operation appeared profitable, the agreement permitted submission and acceptance of a joint venture program. If IMC did not submit a joint venture program by May 1, 1966, or if any such program was not approved by Husky, the agreement would terminate on December 15, 1966. In this event, Husky was obligated to repay the loan either in cash, whereupon IMC would also receive a 25% interest in the leaseholds, or by conveying the leaseholds to IMC, in which case IMC would pay Husky 50% of the appraised value of the leaseholds in excess of $3,000,000.

The agreement was modified in June, 1962 whereby Husky borrowed $3,000,000 from the First National Bank of Chicago against a note due December 15, 1966. The bank loan was guaranteed by IMC and IMC agreed to pay 4¾% interest on the note. The proceeds of this loan were used to repay the loan from IMC.

The agreement was again amended in February, 1966, extending the term of the agreement until December 15, 1967, to allow IMC further time to explore the possibility of a joint venture. In December, 1966, Husky agreed to extend the maturity of the bank loan from December 15, 1966 until December 15, 1967.

In December of 1966, representatives of Husky and IMC also met in Los Angeles to discuss, among other things, the termination of the agreement. The district court found that they agreed that if the leaseholds had not been sold prior to September 30, 1967, Husky would reimburse IMC for interest on the $3,000,000 loan after that date.

On November 14, 1967, pursuant to the amended agreement, Husky requested IMC to prepay Husky's $3,000,000 note to the First National Bank by December 1, 1967. IMC did prepay the principal and accrued interest on December 1, and the First National Bank delivered Husky's noninterest bearing $3,000,000 note to IMC.

Representatives of IMC and Husky met in Chicago on November 28, 1967. The question of Husky's reimbursing IMC for interest on the $3,000,000 loan was discussed at this meeting. On December 18, 1967, Husky sent IMC a check for $37,972.60 for interest on the loan from September 30, 1967 through December 15, 1967.

Prior to December 15, 1967, Husky requested that the due date on its $3,000,000 loan be extended from December 15, 1967 to December 29, 1967. IMC agreed on the condition that 6% interest be paid for the extension period. Husky sent IMC a check for $6,904.10 in payment for this interest on December 29, 1967.

Prior to the December 29, 1967 due date, Husky informed IMC that it elected to repay the $3,000,000 loan by conveyance of the phosphate leaseholds. Husky sought, however, to convey the leaseholds in installments over a three-year period (1967–69) so that it would not realize the entire gain during 1967,

thus distorting its per share earnings.[1] Donald Jensen, General Attorney and Assistant Secretary of Husky, drafted a proposed agreement and read the proposal over the phone to an IMC representative. IMC later called Jensen back and told him that IMC wanted the interest increased from 6% to 7% per annum. The agreement in final form embodied the proposed change.

After reciting the terms of the earlier 1961 agreement, the Termination Agreement dated December 29, 1967, stated in relevant part:

"On or before and effective as of December 29, 1967, Husky will convey an undivided 25% of the phosphate leaseholds, as described in attachment 1 of the referenced October 20, 1961, agreement (the 'Leases'), to International with warranty of good and merchantable title and will also deliver to International its promissory note in the amount of $2,250,000.00 bearing interest at 7% with a due date of June 30, 1968. Upon delivery of such assignment and note, International shall surrender to Husky its promissory note of December 1, 1967, in the original amount of $3,000,000.00. If either party is successful in arranging a sale of the Leases at an amount in excess of $3,000,000.00 and upon terms and conditions mutually acceptable to both International and Husky prior to June 30, 1968, the proceeds of such a sale shall be allocated first to the payment of the Husky note plus interest, then International shall receive the next $750,000.00, and thereafter, Husky shall receive 75% of the remainder and International shall receive 25%.

\* \* \* \* \* \*

"If a mutually acceptable sale has not been obtained on or before June 30, 1968, Husky shall convey to International a good and merchantable title

to an additional undivided 40% interest in and to the Leases; and deliver to International its promissory note in the amount of $1,050,000.00 bearing interest at 7%; and International shall surrender Husky's prior note of December 29, 1967, in the amount of $2,250,000.00. If either party is successful in arranging a sale of the Leases at an amount in excess of $3,000.000.00 and upon terms and conditions mutually accepted to both International and Husky prior to January 10, 1969, the proceeds of such a sale shall be allocated first to the payment of the Husky note plus interest, then International shall receive the next $1,950,000.00, and thereafter, Husky shall receive 35% of the remainder and International shall receive 65%.

\* \* \* \* \* \*

"If a mutually accepted sale has not been obtained on or before January 10, 1969, Husky shall thereupon convey to International all of Husky's remaining undivided interest in and to the Leases; and, upon such conveyance, International shall surrender Husky's note of June 30, 1968, in the amount of $1,050,000.00."

The December 29, 1967 agreement also expressly provided for the handling of interest in the event of one contingency:

"At any time subsequent to January 15, 1968, and during the term of this agreement, International is granted the unconditional right and option, upon 90 days' advance written notice, to demand a conveyance from Husky of all of Husky's then remaining undivided interest in and to the Leases. If such a demand is made by International and a conveyance tendered by Husky prior to June 30, 1968, International shall, on June 30, 1968, (i) credit Husky's Note account in the amount of $1,200,000.00 plus interest

---

1. Tax savings presumably were not involved. "Tax considerations did not enter into Mr. Nielson's request, Husky having substantial tax credits against which the entire capital

gain could be offset (App. 150)." Brief for Appellant at 19. IMC apparently accepted the earnings distortion as the motivation for the request. Brief for Appellee at 6.

accrued on such amount, and (ii) on January 10, 1969, International shall issue an additional credit to Husky in the amount of $1,050,000.00 plus interest. Upon such credits being issued, International shall surrender to Husky on January 10, 1969, its promissory note dated December 29, 1967, in the principal amount of $2,250,000.-00."

In January, 1968, Husky sent to IMC its promissory note for $2,250,000, bearing interest at 7% per annum "until the principal hereof shall have become due and payable," and interest at 8% thereafter, due June 30, 1968. Husky also sent assignments of a 25% interest in the phosphate leaseholds. IMC had no prior notice of the form of the note or of the provisions it would contain. On May 8, 1968, IMC returned Husky's $3,000,000 promissory note.

On June 28, 1968, Husky sent to IMC its promissory note for $1,050,000 plus 7% interest as before, due January 10, 1969. Assignments of an additional 40% interest in the leaseholds were also sent. On July 1, 1968, IMC returned Husky's promissory note for $2,250,000. On July 19, IMC demanded payment of the interest due on the note.

On December 31, 1968, Husky conveyed to IMC its remaining 35% interest in the leaseholds. In January, 1969 IMC returned Husky's promissory note in the amount of $1,050,000. No purchaser had been found for the leaseholds between the effective date of the Termination Agreement (December 29, 1967) and December 31, 1968. No interest was paid by Husky on either the $2,250,000 or $1,-050,000 promissory note.

On the basis of these facts, the district court held that Husky's obligation to pay 7% interest on each of its promissory notes until maturity was not dependent upon whether a mutually acceptable sale of the phosphate leaseholds was made prior to the maturity date of the notes and that IMC did not intend to renounce its claim for interest when it surrendered the two notes. Husky argues that these findings and conclusions are clearly erroneous and insists that it was only obligated to pay interest under the Termination Agreement if a purchaser for the leaseholds was found.

II

The two notes upon which the district court entered judgment for interest amounting to $115,000, plus interest thereon, or a total of $116,881.31, each contained a promise by Husky to pay IMC the respective principal amount "with interest at 7% until the principal hereof shall have become due and payable (whether at the stated maturity or by required prepayment, notice of prepayment, declaration or otherwise), and thereafter at the rate of 8% per annum until paid" and in two places on each note reference was made to the payment of interest, "if any" (emphasis added).

The first clause indicates an obligation by Husky to pay 7% interest under any and every circumstance and the "if any" language implies a possible circumstance where no interest would be payable.[2]

However, each note also provided that it was issued "pursuant to an agreement dated December 29, 1967, between the Company [Husky] and International Minerals & Chemical Corporation and is subject to all of the terms and conditions thereof" and therefore the agreement must be examined as well as the notes.[3]

---

2. "If any" has been described as a "clause of precaution" similar to such clauses as *without prejudice, without admitting, claimed, supposed, purported, alleged* and others. D. Mellinkoff, The Language of the Law 185 (1963). A search of Words and Phrases does not reveal any case where its use has influenced the construction of a legal document in any significant way.

3. Even in the absence of the express language, it would be proper under Section 3-119(1) of the Uniform Commercial Code to consider the agreement pursuant to which

The December 29, 1967 agreement stated that the two notes in question would bear interest at 7%; that if a sale of the leasehold interests to an outside buyer was accomplished, "the proceeds of such a sale shall be allocated first to the payment of the Husky note *plus interest;*" that "[i]f a mutually acceptable sale has not been obtained . . . International [IMC] shall *surrender* Husky's . . . note . . .".

Husky contended that although the notes bore interest at 7% prior to maturity, that amount of interest was only payable if a sale to an outside buyer was accomplished since the agreement speaks of the payment of the note "plus interest" whereas in the absence of a sale the note was to be "surrendered" without any reference being made to interest.

However, the provision in the agreement referring to the contingency of IMC demanding an advance conveyance of "Husky's then remaining undivided interest in and to the Leases" also referred to the "surrendering" of each of the two notes. In that provision, the language preceding "surrender" required IMC to "credit Husky's Note account in the amount of $1,200,000.00 plus interest accrued on such amount," and to "issue an additional credit to Husky in the amount of $1,050,000.00 plus interest."

In other words, the agreement made it clear that (1) interest was due and payable to IMC if the leaseholds were sold to an outside buyer and that (2) interest was not due and payable if IMC accelerated the conveyance of all of Husky's

interest in the leaseholds from January 10, 1969 (the latest agreement date for final conveyance) up to June 30, 1968 (the latest date of conveyance under the acceleration clause).[4] Neither of these two contingencies occurred: the leaseholds were not sold to an outside buyer and IMC did not accelerate the conveyance of the final interest.

What did happen was the contingency covered by the use of the words "surrender Husky's note." It is true that this contingency did not expressly state that interest would be due and payable as in the case of the outside purchaser, where the words "plus interest" were used. It is also true that this contingency did not expressly state that interest would not be due and payable as in the case of the acceleration clause, where the words IMC "shall . . . credit Husky's Note account in the [principal] amount . . . plus interest" were employed.

The use of the word "surrender" in the acceleration provision after the express language requiring the crediting by IMC of interest otherwise due and payable by Husky, indicated that the parties use of the word "surrender" in the case of the contingency which did in fact occur—the three-installment conveyance of the leaseholds to IMC—did not automatically imply that no interest was due and payable.[5]

The word "surrender" was also used in the agreement in reference to the $3,000,000 note dated December 1, 1967, upon which Husky had paid interest in full.

the notes were issued: "As between the obligor and his immediate obligee or any transferee the terms of an instrument may be modified or affected by any other written agreement executed as part of the same transaction . . . . " Ill.Rev.Stat. ch. 26, § 3–119(1) (1971).

4. It is not clear why the agreement called for crediting Husky's Note account with interest accrued in the event of an accelerated conveyance since this amounts to merely an accounting entry. However, it does lead to the conclusion that interest was considered to be accruing on the unconveyed portion.

Why this accruing interest should not be owing at the end of the entire term of the agreement whereas it was considered owing at any point prior in time (including the circumstance where Husky procured a buyer) is not easy to comprehend.

5. This interpretation is strengthened by a second provision which referred to a demand for acceleration by IMC: "If the demand is made by International and the conveyance tendered by Husky after June 30, 1968, International shall surrender to Husky, on its due date, the Husky promissory note then outstanding."

Inasmuch as "surrender" was used several times in the Termination Agreement without any fixed meaning relating to the payment or non-payment of interest, it can not take on an application that no interest was intended when used in regard to the two notes at issue. For this reason, cases which define "surrender" in other contexts are not applicable.[6]

## III

■■■■ The keystone of contract interpretation is the ascertainment of the intention of the parties derived from the language they used. The meaning of the words which the parties employed is found by focusing on the words themselves and then drawing back and testing that meaning in the context of the entire contract, the circumstances surrounding its execution, and the manner in which the parties interpreted it by performance. We have heretofore construed Illinois law as permitting the consideration of extrinsic evidence in contract interpretation and such consideration does not require a threshold determination that the contract is ambiguous. Ortman v. Stanray Corp., 437 F.2d 231 (7th Cir. 1971).[7]

In that case Chief Judge Swygert said at 235:

"Admitting evidence of prior negotiations and agreements for the purpose of discovering the meaning of the terms used in the integration does not violate the parol evidence rule. 'Such testimony does not vary or contradict the written words; it determines that which cannot be varied or contradicted.' "

On October 20, 1961, Husky and IMC agreed that IMC would make an interest-free loan to Husky of $3,000,000 for a five-year period from December 15, 1961 to December 15, 1966. The consideration[8] for this sizeable interest-free loan[9] was the granting by Husky to IMC of the exclusive right to examine and explore, at IMC's expense, for a five-year period certain phosphate-bearing leaseholds in Idaho then owned by Husky. As a result of this exploration, IMC "may furnish a Joint Venture Program" which Husky would have the right "to approve or disapprove."

If IMC failed to submit a joint venture program by May 1, 1966 or if IMC submitted a program which Husky failed to approve, then Husky "shall repay the Loan on December 15, 1966 either in cash or property." If Husky elected to repay the loan in cash, IMC would also receive a 25% interest in the phosphate leaseholds. Husky could elect to repay the loan in property by conveying the leaseholds to IMC, in which event IMC was obligated to pay Husky 50% of the appraised value of the leaseholds in excess of $3,000,000.

On February 25, 1966, the October 20, 1961 agreement was amended in several

6. Both parties have cited Illinois law extensively as to the meaning of "surrender" and for other propositions. We assume that both parties accept the fact that Illinois law applies in this diversity case and consequently we have also looked to Illinois law.

7. "If relevant testimony concerning the circumstances surrounding the signing of a contract is offered, it should generally be heard. The meaning of words cannot be ascertained in a vacuum. The function of interpretation of a contract is to ascertain the intention of the parties as manifested by the words they used to evidence their agreement. This cannot normally be done by an isolated inquiry limited to the four corners of a document; it requires that a court attempt to place itself in the same situation as that of the parties at the time of the execution of the contract." 437 F.2d at 234–235.

8. The October 20, 1961 agreement provided that Husky and IMC were agreeing to what followed, including the making of the loan and the examination and exploration of certain properties, "[i]n consideration of the mutual covenants and agreements of the parties."

9. Husky's annual report for 1968 indicated that its total investment in the leaseholds as late as 1967 was only $169,000 and that it realized a gain of $2,831,000 in 1967 and 1968, when it eventually sold the leaseholds to IMC for $3,000,000. Pl.Ex. 50.

respects, one of which was to extend the date when Husky was to repay the loan from December 15, 1966 to

> "[T]he earlier of (a) the 360th day following the earlier of the date on which International [IMC] (i) has furnished a Joint Venture Program to Husky pursuant to IV 2 or (ii) given written notice to Husky of the abandonment of the Joint Venture Program and termination of this agreement or (b) December 15, 1967."

Representatives of IMC and Husky met in Los Angeles, California, on December 20, 1966, as a result of which each party sent to the other party a proposed letter agreement setting forth that party's interpretation of certain agreements reached orally at that meeting. Neither recipient party accepted the other party's proposed draft. Significantly, however, both drafts contained this identical language:

> "... Husky agrees that September 30, 1966 shall be deemed to be the date on which IMC gave Husky notice of abandonment of the joint venture program ...." [10]

Accepting both parties' ascertainment of the date of the abandonment of the joint venture program, the date for repayment of the IMC loan under the October 20, 1961 agreement as amended on February 25, 1966, would have been September 25, 1967. Assuming the existence of these facts and no others, several presumptions would follow if Husky failed to pay the interest-free loan on September 25, 1967. In the first place, the *quid pro quo*—that is, the interest-free loan in consideration for a period of exploration equated in length of time by reference to the period of the loan, as clearly intended in the October 21, 1961

agreement as amended—would end on September 25, 1967, inasmuch as IMC's right to explore with a view to entering a joint venture had ended 360 days earlier. After September 25, 1967, IMC would receive no consideration for continuing the $3,000,000 loan at no interest. At that time the presumption would follow that interest is intended when there is neither presumption of a gift nor other consideration. I Williston, Contracts § 36A, at 106 (3rd ed. 1957):

> "So if money is paid by one person at the request of another, the request, unless the circumstances are such that the inference of a requested gift is possible, implies an offer to repay the money with interest at the legal rate if the requested payment is made.
>
> · · ·
>
> "The contracts implied in fact arising from offers of the sort mentioned in this section are closely connected in the history of the law with quasi contracts."

Under Illinois statutory law [11] another presumption would arise as set forth in 23 Illinois Law and Practice, Interest § 22 at 15:

> "By statute, interest may be allowed on a written instrument stipulating for the payment of money, after it becomes due, *although there is no provision in the instrument for the payment of interest;* but in order to entitle a party to interest on moneys which become due on any instrument in writing, the relationship of debtor and creditor must exist between the parties ...." (emphasis added).[12]

These were some of the circumstances prior to and contemporaneous with the

---

10. Pl.Ex. 16, pp. 1–2; Pl.Ex. 18, p. 1; Pl. Ex. 49, p. 4.

11. Ill.Rev.Stat. ch. 74, § 2 (1971) provides in relevant part:
    "Creditors shall be allowed to receive at the rate of five (5) per centum per annum for all moneys after they become due on any ... promissory note, or other instrument of writing ...."

12. Illinois cases hold that under the statute an *interest-free loan bears interest when it becomes due and after maturity.* Smolikowski v. Laibe, 170 Ill.App. 181, 184 (1912); Harnish v. Miles, 111 Ill.App. 105, 107 (1903).

making of the December 29, 1967 agreement which was the basis for the two notes at issue. If no agreement had been executed at that time, interest would have commenced to run on the $3,000,000 after September 25, 1967. Instead, however, the parties executed the agreement and these surrounding circumstances point in the direction that interest was intended to be paid on the underlying notes.

Husky stated in its brief that "[o]ne of the best guides to interpreting a contract is to examine the conduct of the parties during performance of the contract," citing Prince v. Packer Mfg. Co., 419 F.2d 34, 37 (7th Cir. 1969).

During the existence of the $3,000,000 loan, it was financed from June 29, 1962 to December 1, 1967, through The First National Bank of Chicago.[13]

The parties began to dispute over the payment of interest on the loan at the end of 1966 or the beginning of 1967.

Glenn Nielson was Husky's chief executive officer and its principal negotiator with IMC during the period from 1961 to 1969. In Nielson's memorandum of a meeting with IMC people held on November 28, 1967, he wrote:

"During the conversation it developed that International [IMC] was still paying the interest on the three million dollars, although I had understood we were to pay it from September." [14]

Accordingly, Husky paid interest on December 18, 1967 in the amount of $37,972.60 for the period from September 30 through December 15, 1967,[15] and paid $6,904.10 additional interest on December 29, 1967 for the period through December 29, 1967,[16] or a total of $44,876.70.[17]

In regard to the negotiations leading up to the December 29, 1967 agreement, Allen Spafford of IMC testified that shortly before that agreement (App. at 137):

"I also told Jensen that we expected interest on the unpaid balance of the obligation during the term of the agreement. I went on and explained the reasons for both of these conditions. I told him that we were essentially handicapping our business by letting them have this involvement in the property for the next 13 months —which is what his proposal was, as I remember—and that we would be much better off if we had the property free and clear to permit more straightforward negotiations with potential buyers of the property.

"I said that to have this Husky entanglement was essentially a hardship for IMC, but that we would accept it on these two conditions, provided that we could get rid of the Husky entanglement on a short term notice to Husky and, secondly, that we would get paid interest.

"And I explained that it was the opportunity to receive that interest that was very important and that it was a very important motive that was permitting me to go along with this essential hardship for the company, for IMC."

The district judge could and impliedly did credit this testimony when he found that it was not the intention of the parties that Husky's obligation to pay interest on the two notes in issue be qualified in any respect.

---

13. Husky executed a note to the bank in place of the original note which it had issued to IMC; IMC agreed to pay the interest due to the bank; when IMC paid the bank loan on December 1, 1967, Husky executed a new note for $3,000,000 and delivered same to IMC.

14. Pl.Ex. 20, p. 2. See also, Pl.Ex. 51.

15. Pl.Ex. 24. This represented interest on the Husky note held by the bank to December 1, 1967 and interest on the Husky note held by IMC from December 1, 1967.

16. Pl.Ex. 31.

17. Nielson testified that he paid this interest as a "moral obligation." App. at 151–52. IMC had expended $1.1 million dollars in interest and development expense. Pl.Ex. 44.

## IV

We conclude that the district court's proper consideration of all of the circumstances surrounding the execution of the December 29, 1967 agreement and the resulting finding and conclusion that "it was the parties intention expressed in the provisions of the Termination Agreement and the terms of the promissory notes given pursuant thereto that Husky's obligation to pay interest at the rate of 7% until maturity upon the principal of its promissory notes was not dependent upon whether or not a mutually acceptable sale had been made prior to the maturity of the notes," was not clearly erroneous.

Affirmed.

STEVENS, Circuit Judge (dissenting).

Both the language of the instruments and the character of the underlying transaction persuade me that interest was not payable when either note was surrendered in exchange for a conveyance of property.

## I.

Each of the two notes recites that it was issued pursuant to the agreement of December 29, 1967, and expressly states that it "is subject to all of the terms and conditions thereof." That agreement recited that the parties had decided to attempt to obtain a buyer for the property, and provided for the allocation of the proceeds of sale if a buyer was found. Putting to one side the differences which different dates of sale would create, the basic alternatives covered in the agreement were (1) that IMC would find a buyer; (2) that Husky would find a buyer; or (3) that there would be no sale prior to the expiration of the agreement.

IMC's ultimate control of the property was assured by the last section of the agreement which gave it an unrestricted right, upon 90 days' notice, to demand a conveyance from Husky of its then remaining interest in the leaseholds.[1] Following such a conveyance, Husky would have no further interest in the property or the proceeds of any sale by IMC unless Husky thereafter found an acceptable purchaser.[2] Under the plain language of the agreement, a conveyance by Husky pursuant to IMC's demand would have discharged Husky's entire obligation under the notes, for interest as well as principal, and entitled it to a surrender of any outstanding note.[3] In short,

---

1. More precisely, IMC could make such a demand any time later than 17 days after the execution of the agreement. The first sentence of section 7 stated:

    "At any time subsequent to January 15, 1968, and during the term of this agreement, International is granted the unconditional right and option, upon 90 days' advance written notice, to demand a conveyance from Husky of all of Husky's then remaining undivided interest in and to the Leases."

2. The last paragraph of the agreement stated:

    "At any time following such a conveyance by Husky to International of the full interest in the Leases, but prior to January 10, 1969, and so long as International continues to hold such full title, Husky may continue to attempt to obtain a buyer for such properties. If a sale is arranged during such period in accordance with Article 2 above solely through the efforts of Husky, the credits, payments and percent-

ages provided in Articles 1. and 2. above shall apply. However, it is expressly understood and agreed that nothing in this Article 7. shall be construed to restrict in any way International's absolute ownership and control of the Leases following a conveyance under the terms of this Article 7."

3. The portion of Article 7 not quoted in the above footnotes provided:

    "If such a demand is made by International and a conveyance tendered by Husky prior to June 30, 1968, International shall, on June 30, 1968 (i) credit Husky's Note account in the amount of $1,200,000.00 plus interest accrued on such amount, and (ii) on January 10, 1969, International shall issue an additional credit to Husky in the amount of $1,050,000.00 plus interest. Upon such credits being issued, International shall surrender to Husky on January 10, 1969, its promissory note dated December 29, 1967, in the principal amount of $2,250,000.00.

# 162

the conveyance of property would have paid whichever note was then outstanding in full and required its surrender.

If a buyer had been procured by Husky, Husky would share in the proceeds of sale, provided that the purchase price was in excess of $3,000,000, plus interest on the note.[4] In the event of such a sale, the agreement plainly stated that the note would be payable out of the proceeds of sale, and that such a cash payment would include interest as well as principal.

As events developed, neither party found a buyer. That contingency was covered in the agreement by language, which, as I read it, simply provides that in exchange for a conveyance of property from Husky to IMC, IMC shall surrender the note then outstanding.[5] There is no express reference to the payment of interest, in addition to the conveyance of property. I do not think the agreement can properly be read to imply either (a) that IMC's obligation to surrender the note was conditioned on the receipt of a cash payment equal to

the amount of interest that had accrued; or (b) that a right to receive interest was intended to survive the surrender of the note. In short, I think the reference to a surrender of the note in exchange for the assignment of property was the equivalent of a statement that the assignment would constitute payment in full.

## II.

What I view as the plain meaning of the agreement of December 29, 1967, is entirely consistent with the underlying transaction which gave rise to that agreement.

It is true, of course, that the basic agreement entered into in 1961 created a somewhat unique debtor-creditor relationship. I believe, however, that this relationship can be better understood by emphasizing the fact that Husky was a seller and IMC a purchaser of a valuable asset. Quite obviously, in 1961, when they negotiated the basic agreement, the parties were convinced that the phosphate leases had a value of at least

"If the demand is made by International and the conveyance tendered by Husky after June 30, 1968, International shall surrender to Husky, on its due date, the Husky promissory note then outstanding." IMC places considerable emphasis on the fact that this provision indicated that the parties intended that interest would continue to accrue until the note was surrendered. But, of course, the accrual of interest on IMC's books was a matter of complete indifference to Husky unless Husky was required to pay that interest. And the only contingency under which any obligation to pay such interest is mentioned in the December 29, 1967 agreement is the unlikely event that the parties found a buyer at such a favorable price that the payment of interest would merely reduce the amount of a profit which Husky did not actually anticipate receiving. In other words, Husky merely agreed to have an amount of interest paid with a third party's cash—not with its own.

4. I recognize that the agreement refers to a mutually acceptable sale arranged "by either party," and therefore would entitle Husky to share in the proceeds in the unlikely event that IMC procured the purchaser and did not exercise its right to acquire title on 90 days' notice. Presumably, however, the pro-

visions of the agreement giving Husky an interest in the proceeds contemplated a sale which Husky helped to arrange.

5. Paragraph 3 of the agreement reads as follows:
"If a mutually acceptable sale has not been obtained on or before January 10, 1969, Husky shall thereupon convey to International all of Husky's remaining undivided interest in and to the Leases; and, upon such conveyance, International shall surrender Husky's note of June 30, 1968, in the amount of $1,050,000.00."
The preceding paragraph, dealing with the exchange that was required on June 30, 1968, if an acceptable sale had not yet been made, was identical except that the surrender of the then outstanding note was in exchange for property interests, including (a) a new note, and (b) a partial assignment of the leasehold interest. In neither paragraph 2 nor paragraph 3 was there any reference to the payment of interest in connection with a surrender of a note in exchange for property. Instead, the language was parallel to that used in paragraph 1 when admittedly the surrender of the original $3,000,000 note in exchange for a new note in a lesser amount and a partial assignment of the leases did not contemplate any interest payment.

$3,000,000, and probably more if properly developed. In essence, in 1961 Husky transferred control of those leases to IMC for a price of $3,000,000 plus an additional contingent benefit—sometimes described as a "kicker" or "bonus."

Pending receipt of its contingent bonus, Husky retained legal title to the property—no doubt for security purposes—but the significant indicia of ownership were all transferred to IMC when the original agreement was executed in 1961. IMC assumed the burdens of ownership, such as the obligation to pay real estate taxes, minimum royalties, minimal rentals, and all responsibility for such mandatory prospective or development work as might be necessary, and it acquired the same rights to use and develop the property as would an outright owner.

Depending on the results of IMC's exploration and development, the bonus for Husky would have been payable in different ways. For example, if IMC determined that it could successfully mine and work the phosphate, it might offer Husky a minority interest in a joint venture program[6] but Husky was not required to participate. If Husky accepted such an offer, the minority interest in the joint venture would represent its bonus or, in effect, the payment of the balance of the original purchase price. If Husky rejected such an offer, and if the appraised value of the properties then exceeded $3,000,000, Husky was entitled to an amount equal to 50% of that excess. Of course, if the appraised value was less than $3,000,000, and if Husky did not elect to participate in a joint venture, Husky would receive no bonus.

If IMC did not submit a joint venture proposal to Husky, Husky had two options. It could reacquire control of 75% of the property for a price of $3,000,000;[7] quite obviously it would not make that election unless it appraised the property as worth at least $4,000,000. Alternatively, it could simply assign title to the leaseholds to IMC. The former option was described in the agreement as a repayment of the loan in cash; the latter as a payment of the loan in property. In sum, if the property should be worth less than $3,000,000, there would be no justification for any bonus for Husky and the final closing of the transaction would simply involve the release of Husky's security interest in the property and its retention of the $3,000,000 payment which had been made by IMC in 1961; the original $3,000,000 "interest free loan" would then constitute the entire purchase price and IMC would have unencumbered ownership of the property.

As events turned out, the parties decided that neither wanted to undertake development of the property. On December 29, 1967, Husky was unquestionably entitled to transfer the leaseholds to IMC in exchange for a surrender of the $3,000,000 note. No interest would then have been payable. Instead of exercising that right, however, Husky requested, and IMC agreed, to divide the assignment as well as the surrender of the note into three parts in order to avoid a distortion of its annual earnings and presumably to spread the tax consequences of the transaction over a three-year period. If the 1967 agreement is regarded as primarily designed to provide for the method of repaying an existing debt, it is quite reasonable to con-

---

6. Article V, (1) provided in part:
"Upon the execution of the Joint Venture Agreement and the making of all required capital contributions International shall participate 60% and Husky shall participate 40% in the profits and losses of the Joint Venture and all additional capital contributions thereafter shall be made 60% by International and 40% by Husky."

7. It was authorized "to repay the Loan in cash . . . [and] concurrently with such repayment assign to International good and merchantable title to an undivided 25% interest in the leaseholds created by the Leases."

clude—as the majority does—that an implied obligation to pay interest arose to compensate the lender for the delay in receiving payment of the principal. But if the 1967 agreement is viewed as prescribing the final steps to be taken in the wind-up of a somewhat complex sales transaction in which the original $3,000,000 payment represented the minimum purchase price for the transferred assets, no reasonable justification for an interest charge is apparent.[8]

The postponement of the final conveyance of Husky's legal title did not interfere in any way with IMC's right either to use the property or to sell it to a third party. IMC already possessed all significant indicia of ownership and had an unqualified right to demand a full conveyance on 90 days' notice. Moreover, as the agreement plainly stated, the postponement also gave IMC the benefit of having Husky cooperate in the attempt to procure a purchaser.

I find it hard to believe that Husky would agree to pay the amount of interest claimed in order to obtain the benefit of spreading its capital gain over a three-year period; after all, the value of the use of the money needed to pay the tax is obviously only a fraction of the total purchase price.[9] On the other hand, since the postponement really cost IMC nothing, I find it hard to credit its claim that the right to receive interest

motivated its acceptance of Husky's proposal.

In sum, I think the agreement which simply provides that the note shall be surrendered in exchange for an assignment of the leases means exactly what it says.[10] I respectfully dissent.

8. Under the agreement, the only way in which IMC could recover its original $3,000,000 payment (other than by developing the property) was by way of a sale at a higher price, either to a third party or through a repurchase by Husky (see note 7, *supra*). Since it appears that the property could not be sold for more than the $3,000,000, it seems unrealistic to treat the purchaser's retention of the basic purchase price as justifying an interest payment to compensate for the use of that money.

9. I recognize that the record indicates that tax consequences did not play any part in Husky's motivation and that Husky merely desired to avoid a distortion of its 1969 earnings. If that be the fact, it is particularly hard to understand why Husky would elect to pay $115,000 in interest to avoid the

cost or the consequences of an explanatory footnote in its annual statement.

10. I do not contend that the use of the term "surrender" necessarily implies that no interest was due and payable. I do contend that an obligation to surrender a note in exchange for a conveyance of property unaccompanied by any cash payment is inconsistent with a claim that an obligation to pay interest survived the surrender of the note or a claim that the note did not have to be surrendered in response to a tender of the property. As I read the entire 1967 agreement, every time the word "surrender" is used, it has exactly the same meaning. Only in the event of a sale to a third party is IMC's obligation to surrender the note conditioned on the payment of any cash whatsoever.