**SKK, INC. and Barry Schrager,**
**Plaintiffs-Appellants,**

v.

**CAMBRIDGE SYSTEMS GROUP, INC.,**
**et al., Defendants-Appellees.**

**No. 83–1654.**

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 20, 1983.

Decided Dec. 12, 1983.

---

8. *See supra* note 4.

Andrew M. Schatz, Sachnoff, Weaver & Rubenstein, Ltd., Chicago, Ill., for plaintiffs-appellants.

Jack Russo, Fenwick, Stone, Davis & West, Palo Alto, Cal., for defendants-appellees.

Before CUMMINGS, Chief Judge, ESCHBACH, Circuit Judge, and DUMBAULD, Senior District Judge.*

PER CURIAM.

The principal issue in this diversity case is whether the district court was correct in holding that, under the agreement between plaintiff SKK, Inc. ("SKK") and defendant Cambridge Systems Group, Inc. ("Cambridge"), Cambridge possesses the exclusive right to market SKK's product. The parties [1] have been engaged in several lawsuits concerning their respective rights and obligations under a 1978 agreement for the licensing in the United States and Canada of a computer software system developed by SKK and known as ACF2, and a similar 1980 agreement covering Europe. In February 1983, pursuant to a settlement agreement, the parties settled all matters except for the determination of what restrictions the 1978 agreement contained with respect to SKK's marketing activities on behalf of its product in the United States and Canada. SKK argues that the agreement allows SKK to market ACF2; Cambridge contends that it possesses exclusive marketing rights.

The district court reviewed the agreement and considered extrinsic evidence, including the nature of the enterprises and the conduct and testimony of the parties during the trial and during the prior proceedings over which the same judge presided. The court held that in the 1978 agreement as modified by the settlement agreement SKK did not reserve marketing rights co-equal with Cambridge's marketing rights. The court therefore enjoined SKK from "marketing ACF2 or engaging in activities which may reasonably be perceived as marketing" in the United States and Canada. Its order sharply restricts and extensively delineates SKK's rights to contact prospective customers and to advertise. SKK has appealed from the order.

We affirm the order of the district court and adopt its Memorandum and Order attached as an appendix to this opinion. We write simply to highlight the arguments of the parties which are based upon the language of the 1978 agreement and to address plaintiffs' contention that it was inappropriate for the district court to consider extrinsic evidence in interpreting the agreement.

The core of SKK's textual argument is found in paragraph 1(b): "Notwithstanding anything herein to the contrary SKK shall have the right to solicit prospective customers of ACF2 provided, however, that while this Agreement shall remain in force, CSG [Cambridge] shall be a party to all contracts for the license, lease, or rental of ACF2 in the Territory." Paragraph 3 seems to define solicitation broadly, wherein it reads, "CSG shall prepare appropriate marketing brochures and shall undertake such advertising, sales promotion *and other customer solicitation* * * * " (emphasis added). Moreover, Cambridge is granted the "*exclusive* right to license, lease, or rent ACF2"

---

* The Honorable Edward Dumbauld, Senior District Judge for the Western District of Pennsylvania, is sitting by designation.

1. Co-plaintiff Barry Schrager is president of SKK. In addition to Cambridge the defendants are William "Shawn" McLaren, its owner, president and chief executive officer, Marjorie Wang-McLaren, an employee of Cambridge and wife of William McLaren, and CSG Limited, a United Kingdom corporation.

(par. 1(b), emphasis added) throughout the United States and Canada, but the word exclusive is not used to describe Cambridge's marketing rights; paragraph 3 states simply that "CSG shall use its best efforts to market ACF2 * * *."

A valid argument based upon the language of the agreement can be made in favor of Cambridge as well. Nowhere does the agreement explicitly define solicitation as applied to SKK's rights to include advertising or marketing;[2] moreover the agreement, in its usage of the terms "solicitation" and "marketing," seems to draw a distinction between their scope as applied to the parties. SKK is granted the right to "solicit" prospective customers but in contrast, the terms "market" and "marketing" are generally applied to Cambridge's rights throughout the agreement. Paragraph 3, which extends over one full page in length, sets out Cambridge's "marketing obligations" to include advertising and sales promotion. Marketing brochures, newspapers, and magazines are explicitly mentioned as appropriate media for Cambridge's marketing efforts. Thus one plausible reading of the agreement is that SKK retained a solicitation right, which under the agreement is a much narrower right than the marketing rights conferred to Cambridge. That SKK enjoys a narrow right to solicit (undefined by the agreement) is the essence of the district court's holding.

Other portions of the agreement also seem to grant Cambridge expansive marketing rights and to limit SKK's rights. Paragraph 5(e) provides that "CSG shall

market maintenance and support for ACF2 * * *." Paragraph 8 states that "SKK agrees to provide such assistance to CSG in its selling effort as CSG shall reasonably request * * *." Finally, paragraph 14 as amended by a March 5, 1978, rider to the 1978 agreement limits SKK's pre-sale activity further:

> SKK agrees that during the term of this agreement it will not offer * * * for license, lease, rental or otherwise, any computer software program in the area of data security control without first according CSG the right to distribute such computer software program or programs if it should so desire.

These clauses support the conclusion that SKK cannot attempt to market ACF2 co-extensively with Cambridge.

▮ It is undeniable that support can be found for both plaintiffs' and defendants' position within the 29 pages of the 1978 agreement plus amendments thereto. Various portions of the agreement are, as defendants at least acknowledge in their brief, reasonably susceptible to more than one meaning. Therefore consideration of facts and circumstances surrounding the negotiation of the agreement, the nature of the product and enterprises involved, and the conduct of the principals was most appropriate to aid the district court in determining the intention and meaning of the agreement.[3] See, e.g., *Liberty Savings Association v. Sun Bank of Jacksonville,* 572 F.2d 591, 594 (7th Cir.1978); *Ehret Co. v. Eaton, Yale & Towne, Inc.,* 523 F.2d 280,

---

**2.** Secondary sources on the meaning of "solicitation" are inconclusive. Webster's Collegiate Thesaurus 960 (1976), cited by plaintiffs, defines solicit as "to seek (as *advertising,* orders, or votes)" (emphasis added). Yet Webster's New International Dictionary 2393–94 (2d ed. 1957) does not connect solicitation with advertising: among the stated meanings of solicit are "[t]o make petition to" and "to court". Black's Law Dictionary 1248–49 (5th ed. 1979) mentions "[t]o appeal for something" and "to ask earnestly". There is no evidence that the parties were applying any particular textbook definition of solicitation or marketing when they negotiated the agreement. Moreover, "it is one of the surest indexes of a mature and developed jurisprudence not to make a fortress

out of the dictionary * * *." *Cabell v. Markham,* 148 F.2d 737, 739 (2d Cir.1945) (L. Hand, J.), affirmed, 326 U.S. 404, 66 S.Ct. 193, 90 L.Ed. 165.

**3.** Although this Court finds the agreement to be ambiguous as to the marketing rights, if any, enjoyed by SKK, such a finding of ambiguity is not a prerequisite to the consideration of extrinsic evidence by the trial court in an effort to shed light on a contract's meaning. See *International Minerals and Chemicals Corp. v. Husky Oil Co.,* 485 F.2d 153, 158 (7th Cir.1973); *Ortman v. Stanray Corp.,* 437 F.2d 231, 235–236 (7th Cir.1971).

284 (7th Cir.1975), certiorari denied, 425 U.S. 943, 96 S.Ct. 1683, 48 L.Ed.2d 186; *Keep Productions, Inc. v. Arlington Park Towers Hotel Corp.,* 49 Ill.App.3d 258, 263, 7 Ill.Dec. 648, 364 N.E.2d 939 (1977).

■ This Court holds that the district court's construction of the agreement and interpretation of extrinsic evidence were not clearly erroneous. The district court, which was familiar with the dispute by virtue of its involvement in several proceedings with the parties, found sufficient evidence within the agreement and from the conduct of the parties to support its holding that SKK did not reserve substantial rights to market ACF2. For the reasons stated above and the reasons stated in the district court's Memorandum and Order (Appendix *infra*), the March 28, 1983, order of the district court is affirmed.

APPENDIX

IN THE UNITED STATES
DISTRICT COURT

FOR THE NORTHERN DISTRICT
OF ILLINOIS

EASTERN DIVISION

SKK, INC., and BARRY SCHRAGER,                )
                                             )
    Plaintiffs,                              )
                                             )
    vs.                                      )  No. 81 C 2557
                                             )
CAMBRIDGE SYSTEMS GROUP, INC.,                )
CSG LIMITED, and WILLIAM J.                   )
McLAREN and MARJORIE WANG-                    )
McLAREN, individually and d/b/a               )
CAMBRIDGE SYSTEMS GROUP,                      )
                                             )
    Defendants.                              )

MEMORANDUM AND ORDER

Prior to 1978 three young faculty members at the University of Illinois, Chicago Circle campus, developed a data access security computer program package which, in its present form, is denominated as ACF2. The University was not interested in itself marketing the program, which was perfected outside University facilities, and none of the three, Barry Schrager, Scott Krueger and Eberhard Klemens ("the developers"), had anything beyond the most rudimentary experience in marketing.

In 1975 Shawn McLaren had developed a computer package known as ASM2 and had formed his own small company, Cambridge Systems Group, Inc. ("Cambridge"), initially consisting of himself and his wife, to market that product. He found that his strong technical background meshed well with a new-found proclivity for marketing, and the company, while remaining small, prospered.

In late 1977 the developers, while still maintaining their positions at the University of Illinois, were looking toward the marketing of the product. That required a product, and by October, 1977, Barry Schrager was spending his free time writing code. In February, 1978, Barry Schrager and Klemens spent considerable time in London, Ontario, for development test-site work.

Marketing also required a marketer, and the developers had little interest in transferring their rights to IBM and having their product become another IBM product. At that time, in view of their limited business experience, they turned to Barry Schrager's brother, Leonard, for assistance. Leonard was a name partner in the firm which thereafter represented them and had extensive experience in business-oriented law, although he had no background in computers or computer technology.

The initial contacts between the developers and Cambridge came in late 1977. Cambridge was then, as now, represented by William Fenwick and the law firm of which he was a partner. Mr. Fenwick had extensive experience in computer-related legal issues and relationships. Shawn McLaren recognized the potentialities of ACF2 and the possible marketing compatibility of ACF2 with ACM2 [*sic i.e.,* ASM2]. The developers recognized the desirability of marketing through another small company which had considerable technical capability and a technically-oriented marketing approach—a marketing arrangement which would also permit them to remain with considerable control over the future of the product. This led, on March 5, 1978, to an

agreement between the developers' new company, Schrager, Klemens & Krueger, Inc. ("SKK") and Cambridge. That agreement gave Cambridge marketing rights, and it is the nature of those rights and SKK's retained rights which is the subject of the present dispute. That agreement will be discussed more fully hereafter. The arrangement was enormously successful, and ACF2 became the major competitor to RCAF, the IBM access security product. That led, in February, 1980, to another agreement conveying to Cambridge marketing and servicing rights in Europe. Thereafter, over a period of time the relationship among the developers deteriorated, with disputes arising between Barry Schrager and Krueger on the one hand and Klemens on the other, resulting, eventually, in the ouster of Klemens from SKK. In the meantime, Schrager and Krueger had become dissatisfied with the progress of marketing in Europe, and the personal relationship between Schrager and Krueger on the one hand and Shawn McLaren and his wife on the other had also begun to deteriorate.

Shortly after Klemens' ouster SKK, now controlled by Schrager and Krueger, in April, 1981, purported to terminate the European agreement for various claimed breaches of that agreement, while leaving open the possible continuation of the United States agreement (which could be terminated if the European agreement was terminated for cause) if various changes were made. The immediate result was a highly litigious relationship between SKK and CSG which has continued ever since.

SKK in this lawsuit sued Cambridge, which counterclaimed. Klemens sought unsuccessfully to intervene and brought an action against his former compatriots in state court. The federal claims were heard, in the summer of 1981, upon cross-motions for preliminary relief. After what was supposed to be relatively short hearing but what turned out to be a lengthy trial after very intensive and extensive discovery, this court concluded, as a preliminary matter, that SKK lacked cause for termination and ordered on September 24, 1981, that Cambridge (which had temporarily transferred

European marketing to SKK) resume European marketing and that Cambridge retain its North American marketing rights. Within the month it came to light that SKK, despite the highly contentious dispute between SKK and Cambridge then in court had, without advising Cambridge (or the court), embarked upon an extensive advertising campaign in national United States publications which ignored Cambridge's marketing rights. After several pleadings, conferences and orders, this court issued its order of October 30, 1981, sharply restricting promotional activities by SKK. The court had also appointed a special master to administer the preliminary injunction.

Thereafter that later order became the primary battleground, with Cambridge complaining on several occasions that SKK was violating the October 30, 1981 order by violating, in one fashion or another, the marketing restrictions. Those led to a series of hearings before the special master (some of them extensive), full briefing, subsequent recommendations by him to this court and, almost invariably, objections to the recommendation and more briefing. Interspersed were various telephonic conferences, emergency motions and conferences. In the meantime, Klemens had composed his differences with Schrager and Krueger, which resulted in his permanent withdrawal, in return for various considerations, from the affairs of SKK, and both the 1981 orders were on appeal. In the meantime, also, SKK had invoked the quota provisions of the European agreement over the protests of Cambridge and, thereafter, in 1982, in a second federal action before this court, 82 C 1621, sought to oust Cambridge from marketing ACF2 in Europe on the ground that it had failed (or would fail) to meet the European quota.

In what was again supposed to be a relatively short trial, the parties squared off again in January of this year. After two weeks of testimony, with considerably more to come, this court again urged the parties to attempt to resolve all their differences. By then this essentially commercial dispute between two small companies had generat-

ed more paper than, or at least as much as, any case this court has had, and had occupied a considerable proportion of the time over an extended period which this court had to devote to civil trials.

Over the following two weeks this court was almost entirely engaged in the settlement discussions between the parties. The result was an extensive and detailed agreement which, in its essential respects, resolved all outstanding disputes by SKK taking over marketing in Europe, Cambridge retaining marketing rights in North America, the parties adjusting their relationship in North America in a number of respects, and SKK paying certain compensation to Cambridge. The 1982 case was dismissed, the appeal of the 1981 case was dismissed and all claims in the 1981 case were dismissed except the issues now before the court.

The issues now before the court largely stem from the October 30, 1981 order and were the substance of the continuing disputes before the special master. SKK contends that the March 5, 1978 agreement permits it to engage in whatever ACF2 marketing activities it believes appropriate. Alternatively, it contends that even if there are restrictions they are far less than those which Cambridge, largely successfully, urged before the special master. Cambridge, conversely, contends that its marketing rights permit it to control marketing entirely, and that means largely divorcing SKK from any contact with prospective customers. After the parties agreed on the basic settlement terms the court conducted yet another hearing, this one blissfully short, and the matter is before the court for decision.

Throughout all this enormous legal effort and acrimony ACF2 has continued to enjoy great commercial success in the United States and, to a considerably lesser extent, in Europe. Indeed, one wonders how these litigations could have been pressed were it otherwise. The nature of these litigations has, however, given the court extensive contact with the principals both in court and in conferences and has provided a background context far greater than is normally the case in litigated actions. In the court's view the remaining issues, while of course having significant economic implications, are greatly influenced by the progress of the litigations, with the principals of SKK firmly believing that Cambridge has unfairly sought to deprive them of the opportunity for public dialogue about their own unique product and Cambridge firmly believing that SKK's efforts to participate in any public dialogue about ACF2 or access security programs is part of a larger effort to destroy Cambridge's marketing rights. We turn then to the specific issues which are before the court.

SKK contends that it has a right to market ACF2 in the United States and Canada, a right which is coextensive to the rights of Cambridge. It recognizes that, during happier days, it consistently described ACF2 in its technical publications as exclusively marketed by Cambridge and, indeed, has continued to do so on occasion in its pleadings in these litigations, but it contends that the rights granted to Cambridge restrict any grant of marketing rights to another, but not its marketing efforts as owner. It also recognizes that, until the aborted advertising campaign in the fall of 1981, it did not engage in any prior sustained or systematic marketing efforts but it argues that this was a matter of choice—it did not do so during that period because of limited resources and other responsibilities. Cambridge points to the contract language and past practices, contending that SKK's present assertion is clearly an afterthought.

The agreement is not self-defining, primarily because of the right accorded SKK in par. 1(b) "to solicit prospective customers of ACF2". Indeed, Shawn McLaren in an answer to one question during the 1981 hearing conceded that SKK had marketing rights, based on the "solicit" language. This court does not view that answer to a question arising in a different context and focused solely on the one clause, as providing the answer to the dispute here. Indeed, it was not uncommon in the various hearings, in which strong feelings were in-

volved, to have recollections and responses vary somewhat by the context of the questioning. That answer does, however, illustrate as well as anything that SKK's contentions cannot be summarily dismissed. We turn then to the course of negotiations, the language of the agreement, the subsequent practices of the parties, and the commercial context in which these all occurred.

Cambridge originally would have preferred to have acquired ownership of ACF2, with the developers receiving royalties. That preference was abandoned by the middle of January, 1978. The basic structure of the agreement was established by a draft contract prepared by Leonard Schrager, with perhaps some reliance upon an earlier rough outline from Fenwick. In any event, that draft was the subject of discussions in Chicago in February, 1978. Although various proposals were considered by the parties at that meeting, the participants, both Schragers, McLaren and Fenwick—Krueger may also have attended but he does not recall it—agree on one thing, that the references to the "solicit" language were limited. Barry Schrager believes he referred to the SKK position in a telephone conversation and that Leonard Schrager explained at his office that it was a protection to SKK, which could sell if necessary although Cambridge would receive its 50 per cent share. Leonard Schrager's recollection was substantially similar. Shawn McLaren testified that Barry Schrager expressed a concern in a telephone call about approaching old friends and that his brother and Fenwick discussed, at the meeting, that talking to old friends would or could be a technical violation without the solicitation language. Fenwick testified that the Chicago meeting was in the context of prior discussions about purchasing marketing rights rather than ACF2 itself—an unusual arrangement. His recollection of the events in Chicago was similar to that of McLaren. Everyone agrees that there was no extended conversation on the subject and that no one specifically referred to co-marketing, parallel advertising and the like.

After this court's extensive involvement with the parties over the past two years it cannot conclude that the parties expressly agreed that the "solicit" clause would allow SKK to have full marketing rights. McLaren might have so agreed eventually, after protest, believing that Cambridge's performance would make any resort to such an option unlikely. But this court considers it highly improbable that McLaren (and Fenwick) would have without objection consented to a parallel marketing effort. His own perception of Cambridge as an established company with a unique approach to marketing and as the dominant force in a partnership of technical and marketing capabilities argues powerfully against any other conclusion.

The then circumstances and the structure of the agreement also militate against SKK's position. In February, 1978, Cambridge was small but it was established. SKK was newly formed, a corporate vessel for ACF2 which was transferred to it by the developers coincidentally with the agreement between SKK and Cambridge, and its start-up funds would come, in large measure, from loans by Cambridge. The developers had virtually no business or marketing experience, and SKK had "developed trust and faith" in McLaren.

The agreement obligated Cambridge to exercise "best efforts" and to pay in excess of $300,000 to SKK each year—a quota which was to prove but a small fraction of the revenues actually generated. SKK agreed to provide to Cambridge, and be reimbursed for, such selling assistance as Cambridge "shall reasonably request". Cambridge had "marketing obligations" to undertake reasonable advertising, sales promotion and "other customer solicitation," with advertisements subject to SKK's "reasonabl[e]" approval. SKK was to provide the technical support. The parties agreed to a cooperative effort because the "marketing" and the "operation" both required "great expertise." SKK agreed not to offer, in the United States and Canada, any data security control-related program without first giving Cambridge a right to distribute it. SKK did preserve "the right to solicit prospective customers of ACF2" (al-

though, literally, not prospective customers of other data security control programs of SKK thereafter distributed by Cambridge).

SKK contends that it did not grant marketing rights in ACF2 and, conditioned by contact [sic] terms, related products, but did not foreclose its own efforts if it paid Cambridge its share; agreed to provide marketing assistance upon request, but that was only when it expected to be reimbursed; and that it did not expressly agree not to advertise or promote. The contract terms are capable of bearing SKK's interpretation, but that interpretation presupposes that the developers (or rather Barry Schrager and Krueger because that certainly was not Klemens' professed understanding), contemplated, while their new company was seeking a marketing "partner," a possible future major parallel marketing effort by a new company with considerable technical capabilities but no marketing capability. The court is persuaded that SKK did hope and expect to solicit those contacts with which it had or developed relationships because of its technical activities (and not just "old friends") and not be foreclosed from approaching those prospects, which was naturally the garden which it could be expected to cultivate with some success. But that is less than the expansive rights SKK now advocates and which the Schragers suggest were discussed in February, 1978. That is, this court concludes, an occasion in which a wish has fathered a recollection.

If, as this court believes, Cambridge has marketing rights exclusive of others, including SKK, what does that mean? When the agreement was executed SKK was well aware that Cambridge had considerable technical capability and emphasized technical aspects in marketing. Cambridge was well aware that SKK's developers were involved in the technical community, had hopes of developing other products and would have significant continuing technical responsibilities. In the aftermath of the contested business divorce this court heard in 1981, SKK insisted there were no restraints on its marketing. Cambridge contended, generally successfully, that any conduct by SKK which impinged upon Cambridge's then concept of marketing was a violation of the agreement or at least the October 30, 1981 order. And Cambridge's concept was, in substance, that any public exposure of SKK related to ACF2 undercut Cambridge's marketing efforts.

That concept goes too far. SKK's principals are not some mad scientists to be locked in a corner of the castle while they tinker with new inventions. SKK is a development company in a dynamic industry. Interaction with colleagues is necessary for professional development; participation in industry affairs is necessary for professional satisfaction and to employ and retain key employees. A feel for what is happening and how ACF2 and other products are perceived is necessary for a full understanding of where SKK should go in developing ACF2 and related products. SKK is not a shadow but a going concern which seeks to establish its own identity. ACF2 is its development, not that of Cambridge. Cambridge has exclusive marketing rights in the United States and Canada, but SKK at all times has had the marketing rights other than there and Europe, and it now has those rights in Europe.

One matter agreed upon by the parties, in the event this court determines, as it has, that SKK's rights are restricted, is that this court should state with some precision what SKK can and cannot do. SKK has, with considerable reluctance, recognized that a mandatory order is part of the overall settlement. The purpose of the post-settlement hearing was to provide a basis for some bright lines for conduct during the post-divorce era.

SKK has urged that its activities before the blowup were less than necessary for attaining non-marketing objectives and were restricted only because of limited resources. Cambridge insists that those activities were, in large part, marketing permitted by Cambridge as a matter of its marketing discretion. The court concludes that the relationship of the parties prior to their dispute is the best indication of what

each considered appropriate in light of their differing functions and needs. What is now appropriate must also be considered in light of SKK's assuming marketing responsibilities in Europe.

The evidence of past practices establishes that SKK personnel did participate, from time to time, in SHARE, Guide and auditing conferences, all of which discourage efforts at marketing presentations. While it is not a certainty that a non-user might sit in at a user conference, that is not the objective of such conferences and the format is not directed toward marketing. In those instances where a user or another did indicate some interest in installations or additional installations, SKK referred them to CSG.

The evidence also indicates that SKK personnel from time to time made presentations to other conferences at which the attendance included persons who reasonably could be described as potential prospects. This did not occasion any great outcry from Cambridge because, this court finds, the level of activity of that nature prior to the litigation was not such so as to constitute marketing in any meaningful way. Indeed, Cambridge was well aware that Linda Vedder was making some presentations and was technically competent to do so. Given her background, this court concludes that it would be unreasonable both to her and to SKK's abilities to employ and retain persons of that experience if they were foreclosed from any public involvement at conferences. Further, SKK did from time to time talk to prospects, generally at the request or with the knowledge of Cambridge because of the particular needs of a pending matter.

Past practices provide much less guidance, however, when the disagreements are over matters which were not even considered, much less discussed, prior to April 1981 or involve practices which were not followed in any meaningful way until after that date. An example of the former is contacts with multi-national corporations regarding foreign sites; an example of the latter is a non-user conference sponsored by

SKK, such as Operation Safeguard. Subsequent practices, such as newsletters, advertisements and listings, are also impacted by SKK's assumption of marketing responsibilities in Europe. It is reasonably clear that the primary focus of computer technology remains in the United States, with Europeans looking to the United States for information. It is also reasonably clear that publication in this country reaches far more persons here than it normally reaches elsewhere in the world. The nature of the publication, of course, makes a difference.

Further, post-dispute practices by SKK evidence its concern about a difference in marketing philosophy, with SKK being interested in visibility wherever possible and Cambridge being far more selective. To the extent that a marketing philosophy should govern, obviously that marketing philosophy should be that of Cambridge, as it has the marketing responsibility. Finally, post-dispute practices also evidence the dynamics of the dispute. Perhaps the best example is "Operation Safeguard," where SKK reasonably was interested in promoting public understanding and awareness of data security problems and also used the occasion for touting ACF2 as the solution to the problem.

The court has considered the above, as well as the specific submissions of the parties. It considers *its* task, pursuant to the settlement negotiations and settlement agreement, to establish "do's" and "don'ts" which properly recognize the differing functions created by the March 5, 1978 agreement as modified by the settlement agreement. It approaches that task with a recognition that European marketing by SKK increases the problem presented because of SKK's need for exposure there and, to some extent, decreases it because Europe provides a previously unavailable forum for the exchange of ideas and information. It also recognizes that restrictions on contacts must be reasonably viewed in light of the infinitely varied circumstances in which contacts occur, and that limitations in practice require good faith and common sense. A possible prospect may be

easily referred to Cambridge in some circumstances; in others, some responses may be necessary to persistent requests for information in order to avoid appearing abrupt or unconcerned. Finally, it should be noted that the order defines what SKK may do, respecting various matters, which necessarily defines the limit which it cannot transgress without violating the order.

For the foregoing reasons, the court orders SKK, Barry Schrager, Scott Krueger, and each of them, and their officers, agents, employees, representatives, attorneys, and all persons acting in concert or participating with them (hereinafter collectively referred to as "SKK"), as follows:

### 1. Conferences in the United States and Canada

SKK may attend any conference in the United States or Canada; it may not engage in marketing activities at those conferences. Because of the nature of such conferences, it may well receive informal inquiries relating to marketing, maintenance and technical matters. With respect to marketing inquiries, SKK must refer the inquirer to Cambridge, limit its response to the least response which the circumstances reasonably permit, and promptly advise Cambridge of the inquiry (hereinafter "a limited response").

SKK may make presentations at user conferences, auditor conferences, SHARE, GUIDE and similar meetings at which presentations are, and are expected to be, non-marketing oriented. SKK may participate in and co-sponsor conferences devoted to problems of computer privacy and security and it may issue press releases for such conferences. For and at such conferences, SKK shall limit its identification to ACF2 to a description of itself as the developer and maintainer of ACF2. SKK may make presentations at not more than two conferences per year of the kind now referred to as an IDOS conference. It shall at such conferences expressly advise the audience orally and, if it presents written or visual material, in that material, that Cambridge is the exclusive marketer in the United States and Canada. SKK shall advise Cambridge reasonably in advance of any presentation at any conference of its intention to do so in order that it can consider any timely marketing objections raised by Cambridge respecting the particular conference. It shall make a limited response to marketing inquiries at any conference.

### 2. Contacts with United States and Canadian users

SKK is not limited in its contact with users, and it may discuss competitive products with users. However, it shall make a limited response to any marketing inquiries.

### 3. Contacts with United States and Canadian non-users

SKK may contact users of competitive products which have installed a competitive product within the previous twelve months to discuss the technical considerations which led to that decision. Since there is, as Shawn McLaren testified, a considerable inertia militating against change once a decision has been made, there appears little reason for concluding that such a non-user can reasonably be viewed as a prospect during that period. Once that twelve-month period has passed, however, SKK should not contact that non-user. It shall give a limited response to any marketing inquiry.

SKK may employ consultants respecting technical and business matters, it may respond to specific technical inquiries from consultants, and it may initiate discussions of technical subjects with technical experts who are not understood to be consultants for particular non-users who are evaluating data security programs. It may contact consultants to non-users who have purchased a competing product within the previous twelve months, if it reasonably believes that the consultant participated in that decision, to discuss the technical considerations for that decision. SKK may contact persons who have been reported in the media as making technical evaluations of data security products which are favorable to a specific product, including ACF2,

but only after determining from Cambridge whether there are marketing reasons why such a contact is inadvisable. In all the above contacts SKK shall make a limited response to any marketing inquiries. SKK shall consult with Cambridge in the event a prospective customer has requested a presentation by SKK or SKK's other involvement in the marketing decision and shall be bound by Cambridge's determination respecting SKK's involvement.

### 4. Advertisements and listings in United States and Canada

SKK may place advertisements in United States publications which are corporate-image advertisements, so long as it confines its references to ACF2 to a description of SKK as the developer and maintainer of ACF2. SKK may advertise in international publications, even though there may be some readers or subscribers in the United States. The court's understanding is that the only publication with a significant readership both in the United States and Europe is Datamation, although the court is unclear as to whether there is a sharp differentiation between a United States and international edition. Assuming that the court is correct in understanding that the Datamation circulated in the United States also is circulated to a reasonably wide readership in Europe, SKK may advertise in Datamation so long as it provides Cambridge with a copy of the proposed advertisement reasonably in advance of publication deadline and, if requested to do so by Cambridge, specifies in the advertisement that ACF2 is exclusively marketed in the United States and Canada by Cambridge. SKK may have listings in directories originating in the United States only if they are circulated in significant volume and relied upon for information outside the United States and Canada, and then only if SKK provides Cambridge with a copy of the proposed listing reasonably in advance of the publication deadline and specifies, upon Cambridge's request, that ACF2 is marketed in the United States and Canada exclusively by Cambridge. The court suggests that a joint listing specifically designating marketing areas should be discussed by Cambridge and SKK for such publications. SKK may list in international listings even though there may be some incidental distribution in the United States. SKK shall not advertise or list except as above described.

### 5. Newsletters

SKK shall not distribute newsletters with marketing information to non-users in the United States, except such incidental distribution to persons such as suppliers, consultants employed by SKK and similar persons who cannot reasonably be considered as prospects or in the decision-making process for prospects.

### 6. Multi-national organizations

SKK to the extent commercially feasible shall market outside the United States and Canada to multi-national companies at foreign sites or headquarters. In the event that commercial feasibility requires that SKK contact a United States office of a multi-national company respecting foreign sites, it shall advise Cambridge of its intention to do so prior to making such contact, shall consider any marketing objections by Cambridge and any alternatives suggested by it, shall, if it does contact the United States headquarters, keep Cambridge advised of the extent of those contacts, and shall, with respect to any marketing inquiries relating to the United States and Canada, make a limited response.

### 7. Interviews by United States and Canadian media

SKK may respond to unsolicited requests for interviews respecting data security, privacy and technical subjects.

Finally, it is not a violation of this order for a person at SKK to discuss ACF2 with persons with whom that person has an ongoing personal or professional relationship so long as Cambridge is promptly advised of any market-oriented interest expressed by that person and all matters respecting price and licenses are referred to Cambridge.

Except as stated above, SKK is permanently enjoined from, in the United States and Canada, marketing ACF2 or engaging in activities which may reasonably be perceived as marketing. "ACF2", for the purposes of this order, includes SKK data security-related programs or products hereafter marketed in the United States and Canada by Cambridge.

/s/ James B. Moran
JAMES B. MORAN
Judge, United States District Court

March 28, 1983