**BAXTER HEALTHCARE CORPORATION, a Delaware Corporation, Plaintiff,**

v.

**O.R. CONCEPTS, INC., a Texas Corporation, Defendant.**

No. 94 C 2877.

United States District Court,
N.D. Illinois,
Eastern Division.

Dec. 6, 1994.

John R. Myers, Bell, Boyd & Lloyd, Chicago, IL, for plaintiff.

Patrick S. Coffey and Deena S. Newlander, Gardner, Carton & Douglas, Chicago, IL, for defendant.

## *MEMORANDUM OPINION AND ORDER*

MANNING, District Judge.

On May 10, 1994, plaintiff Baxter Healthcare Corporation ("Baxter") filed its complaint pursuant to 28 U.S.C. section 2201 for declaratory judgment against defendant O.R. Concepts, Inc. ("O.R.") seeking a declaration that defendant: (1) breached its contract with plaintiff; (2) violated section 2–210 of the Uniform Commercial Code; and (3) breached the covenant of good faith and fair dealing. On May 31, 1994, defendant filed a motion to dismiss plaintiff's complaint and memorandum in support, alleging that the complaint failed to state a claim.

On October 21, 1994, defendant filed a motion to stay discovery, or alternatively for an extension of time to respond to pending discovery. The motion was briefed by both parties. On October 31, 1994, this court granted defendant's motion to stay discovery pending resolution by the court of the motion to dismiss.[1] This memorandum order addresses defendant's motion to dismiss.

### *BACKGROUND*

Baxter is a corporation organized under the laws of Delaware and sells a large range of products to hospitals and other health care providers. Baxter also manufactures some of the products it sells and purchases others for resale. O.R. is a Texas corporation with its principal place of business in Minnesota. O.R. manufactures and sells certain products for the health care field, including a product called Thermadrape, a heat retention drape used to prevent hypothermia.

In January 1992, Baxter and O.R. signed a Distribution Agreement. Jim Elder was the majority stockholder and signed the Distribution Agreement on behalf of O.R. Baxter alleges in its complaint that Elder discussed with the Baxter representative the eventual development of an exclusive distribution relationship. The complaint also alleges that Elder discussed with Baxter his willingness to work with Baxter in identifying customers for the Thermadrape product, that Baxter

would be offered the right of first refusal to distribute O.R.'s new products and favorable pricing not to be increased during the contract period. The complaint further alleges that implicit in the discussions of the parties was an understanding that O.R. would not compete with Baxter in the sale of Thermadrape products.

The Agreement expressly provided for Baxter, as a distributor, to purchase $3 million of Thermadrape and other products from supplier O.R., including existing products and new products. The term of the Agreement began February 1, 1992 and was to comprise a 27 month period. The obligations of both parties were set forth in the Agreement, including a provision in 11(g) that provided:

> "This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns, provided, however, that SUPPLIER shall not transfer or assign its interests in this Agreement without the prior written consent of BAXTER."

The Agreement did not state that it was an exclusive Agreement, nor did it contain a provision that prohibited Elder or any other stockholders of O.R. from selling their shares in the corporation.

In November 1992, Elder advised Baxter that he and others were selling about 95% of the stock of O.R. to Vital Signs, Inc. ("Vital"), a corporation with its principal place of business in New Jersey. Elder remained in control of O.R. until June 1993 when he resigned as president. Elder subsequently informed Baxter that the 120 person sales staff at Vital would begin selling Thermadrape "together with Baxter Healthcare" and that O.R. was relocating to Texas.

On June 18, 1993, Baxter sent a letter to O.R. advising it that O.R. was in breach of the Distribution Agreement by assigning O.R.'s interest in the Agreement to Vital in violation of paragraph 11(g). On May 10, 1994, Baxter sent a second letter to O.R. notifying the company that it was terminat-

---

1. Order dated October 31, 1994, in which court detailed the factors relied upon in granting defendant's motion.

ing the contract and planned to file a lawsuit, which it did.

## DISCUSSION

The issue before this court involves interpretation of a written contract provision. Baxter first maintains that O.R. breached the contract by "transferring" the license agreement to the new corporation without the written consent of Baxter. Baxter asserts that the resulting "transfer" of the license to the corporation, a competitor of Baxter, was in violation of the anti-assignment clause of the Agreement between the parties.

The interpretation of a written contract is a question of law. *Owens v. Midwest Tank and Manufacturing*, 192 Ill.App.3d 1039, 140 Ill.Dec. 123, 549 N.E.2d 774 (1989). A court's primary objective in construing a contract is to give effect to the intention of the parties. *Lucas et al. v. Beaton, Jr. et al.*, 201 Ill.App.3d 341, 346, 147 Ill.Dec. 20, 559 N.E.2d 20 (1990). Where the contract is unambiguous the intent of the parties must be determined as a matter of law from the writing itself. *Quake Construction, Inc. v. American Airlines, Inc.*, 141 Ill.2d 281, 152 Ill.Dec. 308, 565 N.E.2d 990 (1990). A contract is ambiguous only where the language is reasonably and fairly susceptible to more than one meaning. *Farm Credit Bank of St. Louis v. Whitlock*, 144 Ill.2d 440, 163 Ill.Dec. 510, 581 N.E.2d 664 (1991). Assertions by the parties that contrary meanings should be ascribed to the language are not determinative of the issue. *Newcastle Properties, Inc. v. Shalowitz*, 221 Ill.App.3d 716, 164 Ill.Dec. 221, 582 N.E.2d 1165 (1991).

In *Transamerica et al. v. Borg–Warner Corporation*, 1990 WL 186088 (N.D.Ill.1990) a set of facts analogous to those in the instant case was presented. In that case, plaintiff Transamerica Commercial Finance Corporation ("TCFC") filed a four-count complaint against defendant Stockholders Systems, Inc. ("SSI") alleging various warranty breaches and misrepresentation as to a software program. SSI had developed a software program which it licensed to Borg–Warner Financial Services ("BWFS"). BWFS was one of several subsidiaries owned by Borg–Warner Corporation (BWC).

TCFC became the owner of the license to use the software after purchasing all of the stock of Borg–Warner Holding Corporation ("BWHC"), a second subsidiary of parent BWC, to whom the license had been transferred.

SSI filed a counterclaim against counterdefendant BWC alleging that BWFS had wrongfully transferred the license to use the software program to TCFC in violation of the Transfer Restriction Clause of a license issued by SSI to BWFS. The license restriction clause between SSI and BWFS provided that:

> "[BWFS's] rights in and to the [software] and use of same may not be sold, assigned, licensed, or otherwise transferred voluntarily, except to wholly owned subsidiaries of [BWFS] (by operation of law or otherwise) without prior written consent."

The license held by BWFS corporation was transferred to its wholly-owned subsidiary, Borg–Warner Acceptance Corporation ("BWAC"). After transferring the license to BWAC, BWFS then merged into the parent company BWC. Hence, as a result of the merger of BWFS into parent company BWC the license held by BWAC was transferred to BWC. The court held that BWC's liability to SSI for breach of the transfer clause, if any, was limited to any such liability of BWFS to which BWC succeeded by virtue of the merger. The court found that no such liability existed where the transfer by BWFS initially was to a wholly-owned subsidiary of BWFS. As to plaintiff's argument that by selling the shares of stock to a non-wholly-owned subsidiary BWC did indirectly what BWFS could not do directly, the court stated that the restriction clause did not prohibit BWC from doing so. In a footnote the court also stated that the Restriction Clause of the Agreement did not prohibit BWFS, much less BWC its parent company, nor BWHC, from selling its stock to whomever it chose as that was not a right for which the plaintiff had bargained. *Transamerica*, 1990 WL 186088 at p. 3. The court explained that the Transfer Restriction Clause simply prohibited defendant from transferring the license to use the software to other than a wholly-owned subsidiary.

In *Rural Electric Convenience v. Soyland Power Cooperative, Inc.*, 239 Ill.App.3d 969, 180 Ill.Dec. 192, 606 N.E.2d 1269 (1992), plaintiff corporation raised similar objections to the enforcement of a contract acquired by a successor corporation. The court held that plaintiff remained liable on its original contract to purchase electricity from the merged corporation. In that case, plaintiff Rural Electric Convenience Cooperative ("RECC") was a member of Western Illinois Power Cooperative ("WIPCO"), a power distributor, and had entered into a contract in 1963 to purchase all of its electricity from WIPCO. WIPCO eventually merged with Soyland Power Cooperative, Inc. After the merger, RECC sought to be relieved of its contractual obligations. RECC maintained that the duties under the 1963 agreement with WIPCO were neither assignable nor delegable to Soyland because they involved personal performance, a confidential relationship between RECC and WIPCO, and because WIPCO was indebted to RECC prior to the merger. The court held that any delegation of duties from WIPCO to Soyland did not relieve RECC from its duty to purchase its electricity from the merged corporation. *Soyland*, 239 Ill.App.3d at 980, 180 Ill.Dec. 192, 606 N.E.2d 1269. The court, in relying upon section 111.50(d) of the Not For Profit Corporation Act 805 ILCS 105/111.50 (West 1993), stated that the contractual rights and obligations of WIPCO were "transferred" to Soyland upon the "merger." *Id.* at 979, 180 Ill.Dec. 192, 606 N.E.2d 1269. This court finds *Transamerica* and *Soyland* persuasive in the instant case.

■ While factors such as the degree of trust and confidence placed by a party entitled to performance under a contract in the party to perform[2], and the existence of a confidential relationship[3] have been considered important in determining whether the responsibilities of performance can be delegated, where a motion to dismiss is based on the interpretation of a contract which is attached to plaintiff's complaint, the complaint must be dismissed when the contract shows unambiguously on its face that the relief prayed for is not warranted. *Verson Corporation v. Verson International Group PLC*, 1994 WL 6867 (N.D.Ill.1994). Here, there is no express provision prohibiting O.R. from selling the shares of its corporation. The parties did not address that issue in the contract. The complaint itself is of little assistance to Baxter. Baxter simply alleges in its complaint that the parties "discussed" various terms, and that the "intent" of the parties was that eventually their relationship would evolve into an exclusive distribution relationship. Further, the complaint alleges that "implicit" in the parties discussion was a fundamental understanding that O.R. would not compete with Baxter in the sale of the Thermadrape product. The problem, however, is that the parties memorialized their understanding and intent in the written Distribution Agreement which did not include the representations proffered by Baxter. Paragraph 11(b) of the Distribution Agreement specifically provides that:

> "This Agreement is the entire agreement between the parties hereto, there being no prior written or oral promises or representations not incorporated herein."

Had the parties intended that sale of shares by O.R. should be treated as an assignment, they could have provided for it within the four corners of the Agreement.[4] Baxter knew or reasonably could have known that it was dealing with a corporate entity and that at any time the corporation could be merged, consolidated or even dissolved. Hence, the predicament it finds itself in cannot be remedied by this court implying terms the parties did not bargain for. The court finds, as a matter of law, that the contract is unambiguous.

■ Baxter next argues that the sale of O.R.'s stock by Elder and others to Vital was

2. *Ginsburg v. Bull Dog Auto Fire Insurance Association*, 328 Ill. 571, 160 N.E. 145 (1928).

3. *Sally Beauty Co. v. Nexxus Products Co.*, 801 F.2d 1001 (7th Cir.1986).

4. *See, e.g., Lowell I. Stahl et al. v. Century 21*, 1985 WL 1742 (N.D.Ill.1985), where plaintiff entered into regional license with Century 21 which placed limits on the assignability of the license, and further provided that the sale or transfer of more than 45% of the stock of the licensee would be deemed an assignment of the agreement.

an impermissible delegation of performance and assignment of rights contrary to section 2–210 of the Uniform Commercial Code 810 ILCS 5/2–210 (West 1993). Specifically, Baxter alleges that it had a substantial interest in having O.R. under Elder's ownership and control, and that the change and assignment of rights materially changed the duties of the parties, increased materially the burden and risk imposed on Baxter and impaired materially Baxter's chance of obtaining O.R.'s return performance. O.R. maintains that the shareholders' sale of their stock to Vital did not violate the restriction on delegation or performance and assignment of rights set forth in section 2–210 of the Code.

Section 2–210 of the Code provides in relevant part:

"(1) A party may perform his duty through a delegate unless otherwise agreed or unless the other party has a substantial interest in having his original promisor perform or control the acts required by the contract* * *

(2) Unless otherwise agreed all rights of either seller of buyer can be assigned except where the assignment would materially change the duty of the other party, or increase materially the burden or risk imposed on him by his contract, or impair materially his of obtaining return performance* * *."

Both parties cite to *Sally Beauty Co. v. Nexxus Products Co.,* 801 F.2d 1001 (7th Cir.1986), in support of their position. In that case, Nexxus Products entered into a contract with Best Barber & Beauty Supply company under which Best was given an exclusive distributorship for hair care products in Texas (excluding El Paso). Best was acquired by merger into Sally Beauty Company, a wholly-owned subsidiary of Alberta–Culver company, a major manufacturer of hair care products and competitor of Nexxus. Nexxus cancelled the contract after the merger because it did not wish to accept Sally's substitute performance. Sally sued alleging breach of contract by Nexxus. Nexxus filed a motion for summary judgment, maintaining that Best was prohibited from assigning the contract pursuant to section 2–210 of the Uniform Commercial Code.

The court held that Sally's position as a wholly-owned subsidiary of Alberta–Culver was sufficient to bar the delegation of Best's duties under the agreement. The court stated that "the duty under an exclusive distributorship may not be delegated to a competitor in the market place—or the wholly-owned subsidiary of a competitor—without the obligee's consent." The court reasoned that the rule was consistent with the policies behind section 2–210, which is concerned with preserving the bargain the obligee has struck. *Sally,* 801 F.2d at 1008.

*Sally* is distinguishable from the instant case. First, the Distribution Agreement here does not state, nor does Baxter contend that its Agreement with O.R. was exclusive. Indeed, Baxter acknowledges in its pleadings that O.R. used several independent distributors in the distribution of the products, and that the relationship with Baxter and O.R. would eventually evolve into an exclusive distributorship relation. Second, O.R.'s role here was a supplier of products to Baxter, not a distributor as was plaintiff in *Sally.* To be certain, the court in *Sally* clearly stated that its holding was limited to those instances where an "exclusive distributorship" exists. The court found that the consideration for granting Best the exclusive distributorship was that Best would exercise its "best efforts" and that in exchange Nexxus would not supply any other distributors in the territory granted Best. That element is clearly not present in the instant case. O.R. simply agreed to supply Baxter with Thermadrape and other products and Baxter agreed to purchase $3 million dollars worth of these products over a period of 27 months.

Section 2–210 of the UCC does not prohibit a party from performing its duties through a delegate, and in fact provides for delegation in certain instances. Baxter has not expressly pleaded why it has a substantial interest in having Elder and O.R. perform or control the supply of the Thermadrape products. In fact, Baxter's contention here is that Vital is a competitor and that the return performance anticipated from O.R. cannot be expected from Vital. However, Baxter has

not alleged that Vital has increased the price of Thermadrape products, supplied or threatened to supply inferior products, or taken customers to whom Baxter has previously sold products. An inference can be drawn that in the absence of an exclusive supply agreement with Baxter, O.R. continued to supply its products to other distributors even after the Agreement with Baxter. Those distributors would likewise have been competitors of Baxter. There are no facts in the pleadings as to why performance by Vital would materially alter the duty, risk or impair the obligations of the parties. This fact, juxtaposed with the fact that Baxter's commitment under the agreement with O.R. was specific as to dollar amount and period of performance, reduces significantly any risk that Baxter can anticipate.

■ Baxter's final argument is that by selling its shares of stock to a competitor without Baxter's consent, O.R. has breached the covenant of good faith and fair dealing. Baxter maintains that the Distributor Agreement was reached with the intent that the parties would be supplier and distributor, not competitors. Baxter cites to *SKK, Inc. v. Cambridge Systems Group, Inc.,* 723 F.2d 553, 556 (7th Cir.1983), for the proposition that where a contract does not prohibit a supplier from competing with its distributor, nor grant the distributor the exclusive right to sell the supplier's product, but contains a right of first refusal, an inference can be drawn that the supplier was not allowed to compete.

■ This court first notes that SKK has been overruled.[5] Further, the district court in SKK relied on extrinsic evidence in its interpretation of the contract. The Seventh Circuit found that support for both plaintiffs' and defendants' position could be found within the 29 pages of the agreement at issue,

and that the defendants acknowledged in their briefs that the agreement was reasonably susceptible to more than one meaning. *SKK,* 723 F.2d at 555. The Seventh Circuit thus found the district court's construction of the agreement and interpretation of extrinsic evidence were not clearly erroneous. *Id.,* at 556. Moreover, in *Sunstream Jet v. International Air Service Co.,* 734 F.2d 1258, 1267 (1984), the Seventh Circuit stated that the often cited *Ortman*[6] decision, which was relied upon by the trial court in *SKK,* could not be harmonized with other Illinois cases involving the parol evidence rule. The *Ortman* decision was cited in *SKK* and other cases for the proposition that "a finding of ambiguity is not a prerequisite to the consideration of extrinsic evidence by the trial court in an effort to shed light on a contract's meaning." *See, e.g., SKK v. Cambridge Systems Groups Inc.,* 723 F.2d 553 (7th Cir.1983); *Indiana Farm Bureau Cooperative Association, Inc. v. Chicago Regional Port District,* 552 F.Supp. 270, 274 (N.D.Ill.1982). However, the Seventh Circuit in *Sunstream* made clear that a trial court must find a contract ambiguous, as a matter of law, before extrinsic and parol evidence is introduced at trial for consideration by the trier of fact. *Sunstream,* 734 F.2d at 1267. In any event, this court need not consider extrinsic evidence where the contract in question contains no ambiguity. *See, e.g., Sunstream,* 734 F.2d at 1268.

■ As a matter of law, good faith and fair dealing is implied in every contract. *Patel v. Dunkin' Donuts of America, Inc.,* 146 Ill. App.3d 233, 236, 100 Ill.Dec. 94, 496 N.E.2d 1159 (1986). Further, allegations of failure to act in good faith in the performance of duties arising under section 1–203 of the UCC do not state a claim for relief. *Washburn v. Union National Bank & Trust Company of Joliet,* 151 Ill.App.3d 21, 26, 104

5. *Sunstream Jet Express, Inc. v. International Air Service Co., LTD.,* 734 F.2d 1258, 1267 (7th Cir. 1984).

6. *Ortman v. Stanray Corporation,* 437 F.2d 231, 235 (7th Cir.1971). The court held that relevant parol evidence is always admissible to assist in the determination of what the words used in an integrated writing mean; and the parol evidence rule is placed in its proper role of focusing interpretation on the meaning of terms embodied in the writing and of rendering all evidence inoperative to vary those terms once their meaning has been discovered. Admitting evidence of prior negotiations and agreements for the purpose of discovering the meaning of the terms used in the integration doe not violate the parol evidence rule. 'Such testimony does not vary or contradict the written words; it determines that which cannot be varied or contradicted.' "

**612**

Ill.Dec. 242, 502 N.E.2d 739 (1986). As a matter of law, this court finds that there is no breach of an implied covenant shown here by the pleadings. *Patel v. Dunkin' Donuts of America, Inc.,* 146 Ill.App.3d 233, 237, 100 Ill.Dec. 94, 496 N.E.2d 1159 (1986).

On a motion to dismiss, the court accepts all well-pleaded factual allegations as true, *Johnson v. Martin,* 943 F.2d 15, 16 (7th Cir.1991), as well as all reasonable inferences drawn from those allegations. A party fails to state a claim upon which relief may be granted only if that party can prove no set of facts upon which to grant legal relief. *Ross v. Creighton University,* 957 F.2d 410, 413 (7th Cir.1992).

### CONCLUSION

In the instant case, plaintiff has failed to set forth sufficient facts upon which its motion for declaratory judgment can be granted. Accordingly, we grant defendant's motion to dismiss.