SUNSTREAM JET EXPRESS, INC., a
Delaware corporation,
Plaintiff-Appellant,

v.

INTERNATIONAL AIR SERVICE CO.,
LTD., a California corporation,
Defendant-Appellee.

No. 82–3019.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 12, 1984.

Decided May 22, 1984.*

Rehearing and Rehearing
In Banc Denied
June 27, 1984.

---

* This opinion has been circulated among all judges of this court in regular active service. No judge favored a rehearing *en banc* on the question of overruling, in part, *Ortman v. Stanray Corp.,* 437 F.2d 231 (7th Cir.1971).

**1260**

Frank C. Stanley, Chicago, Ill., for plaintiff-appellant.

Christopher A. Hansen, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, Ill., for defendant-appellee.

Before BAUER, WOOD and COFFEY, Circuit Judges.

COFFEY, Circuit Judge.

Plaintiff-appellant, Sunstream Jet Express, Inc., appeals the judgment of the United States District Court for the Northern District of Illinois, that the defendant-appellee, International Air Service Co., did not breach the parties' Aircraft Lease Agreement. We affirm.

**I**

The record reveals that Sunstream Jet Express, Inc. ("Sunstream"), is a Delaware corporation, with offices in West Chicago, Illinois, that leases, buys, and sells aircraft. International Air Service Co. ("IASCO"), is a California corporation that trains flight crews and operates commercial aircraft. In January 1979, Richard Jack, executive vice-president of IASCO, and Frederick Hatton, senior vice-president of IASCO, entered into negotiations with Norman Lively, president of Sunstream, concerning the sale of a certain "Falcon 20–D" jet aircraft, serial number 221, Federal Aviation Administration ("FAA") registration number N 300 NL, owned by Sunstream. IASCO sought to purchase the aircraft from Sunstream because it was one of only thirty-four "Falcon 20–D" aircrafts originally built with a custom cargo door, allowing for more efficient loading and unloading of odd-sized freight.[1] At the time of the negotiations with Sunstream, IASCO was attempting to secure business in the competitive freight shipping industry and IASCO viewed its acquisition of Sunstream's custom "Falcon 20–D" aircraft as an opportunity to improve its freight shipping capacity. Following a series of negotiations, IASCO and Sunstream agreed, in May 1979, that IASCO would lease, rather than buy the aircraft as originally planned, for a two-year period, commencing June 1, 1979.

In October 1979, some four months after Sunstream delivered the aircraft to IASCO, the parties reduced the terms of their lease agreement to a written contract, entitled "Aircraft Lease Agreement." According to the terms of that contract, the rental period extended from June 1, 1979, until May 31, 1981, with IASCO obligated to pay Sunstream $57,500 a month during the first year and $52,500 a month during the second year of the agreement. The contract further provided, in pertinent part:

"**1. DEFINITIONS.**

The terms defined in this section shall have the following meanings for all purposes of this Lease and shall be equally applicable to both the singular and plural forms of such terms:

(a) "Aircraft" as used herein shall mean that certain Falcon 20 jet airplane, serial number 221, F.A.A. registration number N 300 NL, including the Airframe (as hereinafter defined), the General Electric Engines (as hereinafter defined) presently installed on such aircraft and any and all appliances, parts, instruments, appurtenances, accessories, furnishings or other equipment of whatever nature incorporated or installed in or attached to the Airframe or the Engines.

(b) *Airframe.* "Airframe" as used herein shall mean the aircraft exclusive of the Engines.

(c) *Engine.* "Engine" as used herein shall mean the two General Electric CF 700 engines presently installed on the Airframe, as follows:

---

1. The record reveals that Federal Express owned thirty-two of the remaining thirty-three "Falcon 20–D" aircraft with cargo doors and that following the negotiations between IASCO and Sunstream, IASCO purchased the lone remaining "Falcon 20–D" aircraft, with cargo door, from an undisclosed third party.

*ENGINE SERIAL NOS.*

| AIRFRAME NO. | LEFT HAND ENGINE | RIGHT HAND ENGINE |
|---|---|---|
| 221 | 299065 | 299110 |

or any engines which may be substituted therefore as hereinafter provided.

\* \* \* \* \* \*

## 8. MAINTENANCE AND OPERATION OF THE AIRCRAFT.

(a) *Maintenance.* Lessee shall at its sole cost and expense perform, or cause to be performed, all maintenance, service and repairs, including but not limited to, damage repair costs and premature failure costs, necessary to keep the Aircraft, its accessories and equipment, in a fully operable condition equivalent to its condition at the time of delivery (reasonable wear and tear excepted) so that such Aircraft is fully qualified at all times for United States operation under Lessee's FAR 135 certificate. All inspections, maintenance, overhauls, repairs, and replacements shall be in accordance with a maintenance program approved by Lessee and in accordance with operating specifications and maintenance manuals and such other manuals, including those of any manufacturer, as may pertain to Lessee's operation of the Aircraft. All repair, maintenance and replacement work with respect to the Aircraft shall be of good quality, free from defects, and shall be performed in a first-class manner by qualified personnel duly licensed to perform such work in accordance with the applicable regulations of the F.A.A.

(b) *Compliance with Directives.* Lessee shall, at its sole cost and expense, perform or cause to be performed, all airworthiness directives and mandatory notes of the F.A.A. and mandatory manufacturer's service bulletins relating to the Aircraft.

\* \* \* \* \* \*

## 9. ALTERATIONS.

(a) *Alterations, Service Bulletins.* Lessee shall not, without the prior express written consent of Lessor, make any changes, alterations, additions, deletions or replacements to the Aircraft other than as is required for maintenance agreed to be performed hereunder or to maintain the airworthiness of the Aircraft. Service bulletins applicable to the configuration of the Aircraft, Engines and other accessories, equipment and parts installed on, or appurtenant to the Aircraft and issued by the manufacturers of the aforementioned items, shall be deemed Lessor approved changes or alterations. All changes and alterations shall be at the sole cost and expense of Lessee and record thereof shall be entered by Lessee in the appropriate aircraft log books.

(b) *Equipment.* All equipment parts and components of whatsoever kind or nature which are removed from the Aircraft, pursuant to Lessor's approval, shall be replaced, by Lessee at its own cost and expense, with parts of like or better quality.

(c) *Title.* All additions, repairs, replacements and substitutions to, upon or within the Aircraft, shall be deemed accessions to the Aircraft and title thereto shall be in the Lessor and Lessee shall not suffer any accessions to be subject to any purchase money or other security interest nor to any lien or encumbrance, except as provided below.

(d) *Surplus Equipment.* Any part or piece of equipment removed from the Aircraft by Lessee and not traded-in, rebuilt, exchanged or reused, on the aircraft in the performance of its obligations under this Lease shall be shipped upon request by Lessor at Lessor's sole cost and expense to Lessor to such place as Lessor may designate.

\* \* \* \* \* \*

## 16. RETURN OF AIRCRAFT, MAINTENANCE, INSPECTION, RECORDS, REMEDIES AND DELIVERY RECEIPT.

\* \* \* \* \* \*

(c) *Condition at Redelivery.* Lessee shall deliver the Aircraft in the same condition as received, less normal depreciation and wear and normal utilization

of the Airframe and Engines hereunder, with a current F.A.A. Certificate of Airworthiness and in a physical condition to qualify for operation under Lessee's FAR 135 certificate. Lessee shall have no obligation to overhaul the Airframe or Engines prior to return of the Aircraft hereunder. All components, parts and equipment shall bear the original serial numbers or shall have been replaced with items of quality and kind as provided for herein. In the event the Lessee does not return the Aircraft in such condition, the Lessor may make any repairs necessary to restore the Aircraft to such condition, and the Lessee agrees to reimburse the Lessor for any expense involved for said restoration."

At the time of delivery to IASCO in May 1979, the "Falcon 20–D" aircraft consisted of an airframe, serial number 221, FAA registration number N 300 NL, and two General Electric CF 700 engines, serial numbers 299065 (right engine) and 299110 (left engine).[2] According to IASCO's Time and Service Records and the aircraft log book, IASCO removed the original engines (serial numbers 299065 and 299110) from the airframe on March 10, 1980, and replaced them with leased engines, serial numbers 245UH027 and 245UH070. IASCO reinstalled the original engines on May 17, 1980, but some five months later, on October 16, 1980, IASCO removed the original left engine from the airframe and replaced it with a substitute General Electric CF 700 engine, serial number 299G128. Likewise, on November 3, 1980, IASCO removed the original right engine from the airframe and replaced it with a substitute General Electric CF 700 engine, serial number 299H118.

In February 1981, Sunstream learned, through records supplied by IASCO, that IASCO had removed the two original engines from the airframe and had replaced them with substitute engines. In May 1981, Sunstream filed an amended complaint in the United States District Court for the Northern District of Illinois, claiming in count I that IASCO had breached the Aircraft Lease Agreement by removing the original engines from the airframe and replacing them with substitute engines.[3] Sunstream demanded that the original engines be returned to Sunstream and that the substitute engines be deemed "accessions" to the aircraft and returned along with the airframe at the termination of the lease, on May 31, 1981. In the alternative, Sunstream asked for the "fair reasonable market value" of an overhaul to the original engines in the amount of $450,000 and the "fair reasonable market value" of the substitute engines in the amount of $500,000. In count II of the amended complaint, Sunstream sought punitive damages for IASCO's alleged "malicious and fraudulent scheme to deliver to [Sunstream] nonoperable engines at the termination of the Lease." IASCO denied the allegations and raised an affirmative defense that it was entitled to remove the original engines from the airframe and replace them with substitute engines of like or better quality under the terms of the Aircraft Lease Agreement.

On May 31, 1981, IASCO returned the "Falcon 20–D" aircraft to Sunstream with the original airframe, original engine 299065, and substitute engine 299G128. In September 1981, Sunstream filed an emergency motion to transfer aircraft engines,

---

**2.** At trial, it was established that the Aircraft Lease Agreement, inaccurately listed the right engine as serial number 299110 and the left engine as serial number 299065.

**3.** The record reveals that Sunstream filed its original complaint in this case on March 13, 1981, and filed an amended complaint on May 18, 1981. The original complaint is not a part of the record on appeal and thus the allegations contained therein are not referred to by this court. In any event, IASCO and Sunstream

appear to agree that the only noteworthy event occurring between the filing of the original complaint on March 13, 1981, and the amended complaint on May 18, 1981, was that the parties entered into a court approved agreement whereby IASCO would return the aircraft to Sunstream at the termination of the lease, with original engine 299065 and substitute engine 299G128, while retaining original engine 299110 and substitute engine 299H118 until the completion of this litigation.

asking the court to order that the original engine retained by IASCO (serial number 299110), be returned to Sunstream and that the substitute engine attached to the airframe and retained by Sunstream (serial number 299G128), be returned to IASCO. The district court treated Sunstream's motion to transfer aircraft engines as a motion for preliminary injunction and denied the same.[4] The case proceeded to trial before a jury and at the commencement of the trial, Sunstream filed a motion in *limine,* seeking to exclude the introduction of any evidence concerning the monthly rental price of the aircraft, any preliminary negotiations between the parties, any arrangements between Emery Air Freight and either party, any preliminary draft of the Aircraft Lease Agreement, and any aircraft rental contract that was executed between IASCO and third parties. The court denied Sunstream's motion and ruled that "parol evidence will be permitted in this case to assist the jury as the trier of the fact in order that they may determine the meaning and effect of the contract terms and glean the intent of the parties."

At trial, Sunstream and IASCO each introduced evidence explaining the complex nature of the aircraft industry and the meaning of industry-related terms used in the Aircraft Lease Agreement. In summary, the testimony elicited at trial revealed that an aircraft must satisfy stringent Federal maintenance regulations in order to be classified as "airworthy" and, therefore, lawfully safe for flight. According to the terms of the Aircraft Lease Agreement, IASCO and Sunstream agreed that IASCO was to maintain the "Falcon 20–D" aircraft in an airworthy condition, in accordance with IASCO's FAR 135 certificate. The testimony revealed that IASCO's FAR 135 certificate was an FAA approved maintenance program designed to maintain the airframe and engines of the "Falcon 20–D" aircraft in an airworthy condition. IASCO's FAR 135 certificate specifically pro-

vided, with regard to the General Electric CF 700 engines, that individual engine parts were to be replaced at specified intervals and that the entire engine was to be completely overhauled (removed from the airframe, dismantled, repaired, and reconditioned) after 3900 hours of flight time. In the instant case, IASCO removed the original right engine, serial number 299065, in October 1980, after it had accumulated 3811.45 hours of flight time, and removed the original left engine, serial number 299110, in November 1980, after it had accumulated 3752.50 hours of flight time. The estimated cost of overhauling the original engines ranged from $117,601 to $277,459 for the right engine and $120,522 to $276,559 for the left engine. In addition, the testimony revealed that it would take a certified maintenance crew anywhere from forty-five to sixty days to completely overhaul the General Electric CF 700 aircraft engines. IASCO, rather than overhauling the original engines, replaced them with substitute General Electric CF 700 engines, serial numbers 299G128 and 299H118.

Sunstream claimed that under section 9(a) of the contract IASCO was required to obtain Sunstream's written consent before making "any changes, alterations, additions, deletions, or replacements to the Aircraft." In addition, Sunstream claimed that IASCO had a duty to overhaul the original engines after they had reached 3900 hours of flight time. To support this position, Sunstream relied upon section 8(a) of the contract, which provided that IASCO:

> "shall at its sole cost and expense perform, or cause to be performed, all maintenance, service and repairs ... necessary to keep the Aircraft, its accessories and equipment in a fully operable condition equivalent to its condition at the time of delivery (reasonable wear and tear excepted) so that such Aircraft is fully qualified at all times for United

---

**4.** This court's reference to Sunstream's emergency motion is solely for the purpose of setting forth a complete factual and procedural background of the instant case. We do not consider the district court's denial of Sunstream's emergency motion a judgment on the issue of engine ownership.

States operation under Lessee's FAR 135 certificate."

IASCO responded to Sunstream's claims by referring to explicit language in section 1(c) of the contract that defined engine as "the two General Electric CF 700 engines ... *or any engines which may be substituted therefore* as hereinafter provided." (emphasis added). IASCO also referred to section 9(a) of the contract and noted that though IASCO had to obtain Sunstream's written consent to make "changes, alterations, additions, deletions, or replacements to the Aircraft," IASCO did not have to obtain Sunstream's consent "to maintain the airworthiness of the Aircraft." In addition, IASCO cited to section 9(b) of the contract, which provided that "parts and components ... removed from the Aircraft ... shall be replaced ... with parts of like or better quality." Finally, IASCO relied upon section 16(c) of the contract, which provided that IASCO had "no obligation to overhaul the Airframe or Engines prior to return of the Aircraft."

Based upon the foregoing language, IASCO interpreted the Aircraft Lease Agreement to allow it to remove the original engines, without Sunstream's written consent, and replace the engines with substitute engines of like or better quality, in order to maintain the aircraft in an "airworthy" condition. According to testimony elicited by IASCO, it was common practice in the aircraft industry to place substitute engines on airframes and thus keep aircrafts in compliance with Federal regulations and "airworthy" at all times. In fact, IASCO officials testified that during the period of its lease with Sunstream, from June 1, 1979, until May 31, 1981, IASCO had a total of three "Falcon 20–D" jets, requiring six separate General Electric CF 700 engines. In order to assure an "airworthy" fleet during this period, IASCO maintained a pool of eight General Electric CF 700 engines, any one of which could be substituted on a "Falcon 20–D" airframe.

Furthermore, IASCO officials testified that the rental cost of $57,500 a month for the first year of the contract and $52,500 a month for the second year of the contract was approximately $20,000 a month higher than they would normally pay to lease a "Falcon 20–D" aircraft, with cargo door. According to this testimony, IASCO agreed to pay Sunstream the additional sum because of an understanding that Sunstream would use the excess money to perform engine overhauls upon termination of the lease.

The jury found, based upon the evidence presented at trial, that IASCO had not breached the Aircraft Lease Agreement by removing the original engines from the airframe and replacing them with substitute engines. Accordingly, the jury returned a verdict in favor of IASCO on counts I and II of Sunstream's complaint and on August 12, 1982, the district court entered judgment for IASCO. Some two weeks later, on August 27, 1982, IASCO filed a motion in the district court for the award of costs, expenses, and attorney's fees.[5] The district court denied IASCO's motion on September 22, 1982, and on that same day IASCO asked the court to reconsider its decision, requesting that a hearing be held on September 30, 1982. Two days later, Sunstream filed a notice of appeal with this court. On November 2, 1982, this court dismissed Sunstream's appeal because reconsideration of IASCO's motion for attorney's fees was still pending before the district court. On November 30, 1982, the district court granted IASCO's motion for costs, expenses, and attorney's fees and Sunstream then filed a new notice of appeal in this court. For purposes of this appeal, Sunstream contends that the district court erred in allowing extrinsic and parol evidence to be introduced at trial concerning the parties' preliminary negotiations, the preliminary drafts of the contract, and the parties' understanding of the

---

**5.** Section 20 of the Aircraft Lease Agreement provides:

"In the event any action be instituted by a party to enforce any of the terms and provisions contained herein, the prevailing party in such action shall be entitled to such reasonable attorneys' fees, costs, and expenses as may be fixed by the Court."

contract terms. In addition, Sunstream contends that the district court erred by allowing the jury to interpret the Aircraft Lease Agreement, denying Sunstream's request to delete a portion of its complaint in order to conform the pleadings to the evidence, and granting IASCO's motion for costs, expenses, and attorney's fees.

## II

### A. EXTRINSIC AND PAROL EVIDENCE

Sunstream contends that the district court erred by allowing IASCO to introduce extrinsic and parol evidence of the parties' preliminary negotiations and their understanding of the terms used in the Aircraft Lease Agreement. Sunstream initially claims that the integration clause set forth in section 25 of the Aircraft Lease Agreement, and agreed to by the parties, precluded introduction at trial of parol and extrinsic evidence because the clause terminated all prior agreements, understandings, and representations in their entirety. The integration clause in question provides that, "[t]his document constitutes the entire agreement and understanding of both parties and any and all prior agreements, understandings or representations are hereby terminated and cancelled in their entirety and are of no further force or effect." In addition, Sunstream relies upon the parties' agreement that Illinois substantive law is controlling in this case, and claims that IASCO's introduction of extrinsic and parol evidence at trial violated the Illinois parol evidence rule.[6] IASCO counters with the decision in *Ortman v. Stanray Corp.*, 437 F.2d 231 (7th Cir.1971) (*"Ortman"*), where a panel of this court interpreted Illinois law and held that "relevant parol evidence is always admissible to assist in the determination of what the words used in an integrated writing mean." 437 F.2d at 235.

IASCO does not dispute the fact that the integration clause contained in section 25 of the Aircraft Lease Agreement integrates the entire contract on its face and thus establishes that the contract is a complete expression of the parties' agreement. In such a situation, the general rule in Illinois is that "if the contract imports on its face to be a complete expression of the whole agreement, it is presumed that the parties introduced into it every material item, and parol evidence cannot be admitted to add another term to the agreement." *Pecora v. Szabo*, 94 Ill.App.3d 57, 63, 49 Ill.Dec. 577, 581–582, 418 N.E.2d 431, 435–36 (1981); *Storybook Homes, Inc. v. Carlson*, 19 Ill.App.3d 579, 582, 312 N.E.2d 27, 29 (1974). *See also Ireland v. Esposito*, 93 Ill.App.3d 584, 590, 49 Ill.Dec. 48, 53, 417 N.E.2d 738, 743 (1981) (if instrument states that it alone is to constitute the entire agreement between the parties, then parol evidence is inadmissible to vary the terms of that instrument). The presence of an integrated contract, however, is not an absolute bar to the introduction of parol and extrinsic evidence under Illinois law.

In *Air Conditioning Corp. v. Honaker*, 296 Ill.App. 221, 16 N.E.2d 153 (1938), the plaintiff argued, just as Sunstream in the instant case, that "oral evidence was not admissible because of two merger clauses appearing in [the] contract." 296 Ill.App. at 224, 16 N.E.2d at 154. The merger clause appearing on the face of the contract provided that "[t]here is no agreement, verbal or otherwise, which is not set down herein; no waivers or modifications shall be valid unless written upon or attached hereto." *Id.* at 224–25, 16

---

**6.** IASCO and Sunstream agree that Illinois substantive law is to be applied in construing this contract, pursuant to section 23 of the Aircraft Lease Agreement which provides:

"This lease and the rights and duties of the parties hereunder, insofar as is permissible under any applicable law, shall in all respects be governed by, and construed in accordance with the laws of the State of Illinois, including all matters of construction, validity and performance."

We further note that the "parol evidence rule" is recognized as a matter of substantive law in Illinois. *Liberty Savings Association v. Sun Bank of Jacksonville*, 572 F.2d 591, 594 (7th Cir.1978); 1A–2 J. Moore, W. Taggart, A. Vestal, & J. Wicker, *Moore's Federal Practice* ¶ 0.313 at 3187 (2nd ed. 1983).

N.E.2d at 154. Despite this language on the face of the contract, the Appellate Court of Illinois held that "[b]ecause the contract as written was incomplete and ambiguous [the] oral evidence was admissible." *Id.* at 226, 16 N.E.2d at 154. Similarly, in *Storybook Homes, Inc. v. Carlson,* the state trial court found, as a matter of law, that the parties' memorandum was a "final integrated agreement." On appeal, the Appellate Court of Illinois held that:

> "Since the memorandum here is the complete expression of the parties' intent, parol or extrinsic evidence may not be used to alter, contradict or limit the writing in any fashion. *However, parol or extrinsic evidence may be used to explain the terms of an ambiguous contract.* Whether an ambiguity exists is a question of law for the court."

19 Ill.App.3d at 582, 312 N.E.2d at 29 (citations omitted) (emphasis added). Thus, Illinois decisional law provides that even when a contract is integrated on its face, if the contract is ambiguous, as a matter of law, then extrinsic and parol evidence is admissible "to explain the terms of the ambiguous contract." *Id. See also Ireland v. Esposito,* 93 Ill.App.3d at 590, 417 N.E.2d at 743; *Air Conditioning Corp. v. Honaker,* 296 Ill.App. at 226, 16 N.E.2d at 154; 3 A. Corbin, *Corbin on Contracts* § 578 at 411 (1960); J. Calamari, J. Perillo, *The Law of Contracts* § 3–3 at 104 (2nd ed. 1977) (merger clause establishes that the integration is total unless the document is obviously incomplete). Moreover, "[t]he Illinois courts are agreed that the question of the ambiguity is one of law to be determined by the court." *URS Corp. v. Ash,* 101 Ill.App.3d 229, 233, 56 Ill.Dec. 749, 753, 427 N.E.2d 1295, 1299 (1981). *See also Lenzi v. Morkin,* 116 Ill.App.3d 1014, 1015, 72 Ill.Dec. 414, 416, 452 N.E.2d 667, 669 (1983); *Comet Casualty Co. v. Holloman,* 113 Ill.App.3d 271, 275, 68 Ill.Dec. 866, 869, 446 N.E.2d 1263, 1266 (1983); *Joseph v. Lake Michigan Mortg. Co.,* 106 Ill.App.3d 988, 991, 62 Ill.Dec. 637, 639, 436 N.E.2d 663, 665 (1982); *Advertising Checking v. Canal-Randolph Assoc.,* 101 Ill.App.3d 140, 144, 56 Ill.Dec. 634, 637, 427 N.E.2d 1039, 1042 (1981); *National Tea Co. v. American National Bank and Trust,* 100 Ill.App.3d 1046, 1049, 56 Ill.Dec. 474, 477, 427 N.E.2d 806, 808 (1981); *Ancraft Products Co. v. Universal Oil Products Co.,* 100 Ill.App.3d 694, 697, 56 Ill.Dec. 390, 392, 427 N.E.2d 585, 587 (1981); *De Lathouwer v. Kewanee Boiler Corp.,* 94 Ill.App.3d 802, 807, 50 Ill.Dec. 580, 583, 419 N.E.2d 688, 691 (1981); *Sharps v. Stein,* 90 Ill.App.3d 435, 440, 45 Ill.Dec. 742, 747, 413 N.E.2d 75, 80 (1980); *Rao v. Parvathaneni,* 72 Ill.App.3d 1, 5, 28 Ill.Dec. 329, 332, 390 N.E.2d 496, 499 (1979); *Lichtenstein v. Anvan Co.,* 62 Ill.App.3d 91, 96, 19 Ill.Dec. 296, 300, 378 N.E.2d 1171, 1175 (1978); *Terracom Dev. Group v. Coleman Cable & Wire,* 50 Ill.App.3d 739, 744, 8 Ill.Dec. 642, 646, 365 N.E.2d 1028, 1032 (1977); *Gardiakos v. Vanguard Communications, Inc.,* 38 Ill.App.3d 937, 940, 350 N.E.2d 210, 212 (1976); *Nerone v. Boehler,* 34 Ill.App.3d 888, 891, 340 N.E.2d 534, 536 (1976).

At this point in our analysis we must address IASCO's argument that under *Ortman,* the trial court can always admit parol and extrinsic evidence to assist the trier of fact in determining what the words of an integrated writing mean, regardless of whether or not the contract is ambiguous. In *Ortman* a panel of this court interpreted the Illinois parol evidence rule, as it existed in 1971, and held that:

> "[R]elevant parol evidence is always admissible to assist in the determination of what the words used in an integrated writing mean; and the parol evidence rule is placed in its proper role of focusing interpretation on the meaning of terms embodied in the writing and of rendering all evidence inoperative to vary those terms once their meaning has been discovered. Admitting evidence of prior negotiations and agreements for the purpose of discovering the meaning of the terms used in the integration does not violate the parol evidence rule. 'Such testimony does not vary or contradict the written words; it determines that which cannot be varied or contradicted.' "

437 F.2d at 235 (footnotes omitted). Since the *Ortman* decision, this court has, on numerous occasions, cited to and followed the *Ortman* holding when interpreting the Illinois parol evidence rule. In *International Minerals & Chemical Corp. v. Husky Oil Co.*, 485 F.2d 153 (7th Cir.1973), a panel of this court cited *Ortman* for the proposition that, "We have heretofore construed Illinois law as permitting the consideration of extrinsic evidence in contract interpretation and such consideration does not require a threshold determination that the contract is ambiguous." 485 F.2d at 158. In *Lucie v. Kleen-Leen, Inc.*, 499 F.2d 220 (7th Cir.1974) (per curiam) a panel of this court stated that:

"It is well-established that the test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether the instrument appears to be plain and unambiguous, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible."

499 F.2d at 221. In *Ehret Co. v. Eaton, Yale & Towne, Inc.*, 523 F.2d 280 (7th Cir.1975), *cert. denied*, 425 U.S. 943, 96 S.Ct. 1683, 48 L.Ed.2d 186 (1976), a panel of this court interpreted Illinois law and stated that, "[p]arol evidence is always permitted to assist in determining the meaning and effect of a contract term from the intent of the parties." 523 F.2d at 284. Finally, in *SKK, Inc. v. Cambridge Systems Group, Inc.*, 723 F.2d 553 (7th Cir. 1983) (per curiam), this court referred to the holding in *Ortman,* for the proposition that, "Although this Court finds the agreement to be ambiguous ... such a finding of ambiguity is not a prerequisite to the consideration of extrinsic evidence by the trial court in an effort to shed light on a contract's meaning." 723 F.2d at 555 n. 3. *See also Indiana Farm Bureau Cooperative Assoc., Inc. v. Chicago Regional Port District,* 552 F.Supp. 270, 274 (N.D.Ill. 1982); *American Soc., etc. v. Murray Communications, Inc.,* 547 F.Supp. 462, 464–65 (N.D.Ill.1982).

We note that *Ortman* was written in 1971 and construed the Illinois parol evidence rule as it appeared in Illinois case law at that time. The court in *Ortman* admitted, however, that "the language and holdings of the various Illinois cases involving the parol evidence rule cannot be harmonized." 437 F.2d at 235. *See also Ortman,* 437 F.2d at 238 (Hastings, J., concurring) (the net effect of the court's holding would seem to abrogate the parol evidence rule). Since the *Ortman* decision, some thirteen years ago, the Illinois courts have further clarified the issue of when extrinsic and parol evidence is admissible, under Illinois law, to determine the parties' intent in entering into the contract.

■ Our review of recent Illinois decisional law clearly indicates that the trial court must find a contract ambiguous, as a matter of law, before extrinsic and parol evidence is introduced at trial for consideration by the trier of fact. *See, e.g., Lenzi v. Morkin,* 116 Ill.App.3d at 1015, 72 Ill. Dec. at 416, 452 N.E.2d at 669; *Comet Casualty Co. v. Holloman,* 113 Ill.App.3d at 275, 68 Ill.Dec. at 869, 446 N.E.2d at 1266; *URS Corp. v. Ash,* 101 Ill.App.3d at 235, 56 Ill.Dec. at 754, 427 N.E.2d at 1300; *Advertising Checking Bureau, Inc. v. Canal-Randolph Assoc.,* 101 Ill.App.3d at 144, 56 Ill.Dec. at 637, 427 N.E.2d at 1042; *Ancraft Products Co. v. Universal Oil Products, Co.,* 100 Ill.App.3d at 697, 56 Ill.Dec. at 392, 427 N.E.2d at 587; *De Lathouwer v. Kewanee Boiler Corp.,* 94 Ill. App.3d at 807, 50 Ill.Dec. at 583–584, 419 N.E.2d 691–92; *Fox v. Inter-State Assur. Co.,* 84 Ill.App.3d 512, 515, 39 Ill.Dec. 894, 897, 405 N.E.2d 873, 876 (1980); *Great Atlantic and Pacific Tea v. La Salle National Bank,* 77 Ill.App.3d 418, at 483, 32 Ill.Dec. 812 at 816, 395 N.E.2d 1193 at 1197 (1979); *Felbinger and Co. v. Traiforos,* 76 Ill.App.3d 725, 732, 31 Ill.Dec. 906, 911, 394 N.E.2d 1283, 1288 (1979); *Bard v. Harvey,* 74 Ill.App.3d 16, 19, 29 Ill.Dec. 814, 817, 392 N.E.2d 371, 374 (1979), *cert. denied,* 459 U.S. 1172, 103 S.Ct. 819, 74 L.Ed.2d 1016 (1983); *Rao v. Parvathaneni,* 72 Ill.App.3d at 5, 28 Ill.Dec. at 332, 390 N.E.2d at 499; *Terracom Dev. Group v. Coleman Cable*

& *Wire,* 50 Ill.App.3d at 744, 8 Ill.Dec. at 647, 365 N.E.2d at 1033; *Keep Productions v. Arlington Park Towers,* 49 Ill. App.3d 258, at 263, 7 Ill.Dec. 648 at 652, 364 N.E.2d 939 at 943; *Baird & Warner, Inc. v. Ruud,* 45 Ill.App.3d 223 at 229, 3 Ill.Dec. 886 at 891, 359 N.E.2d 745 at 750; *Nerone v. Boehler,* 34 Ill.App.3d at 891, 340 N.E.2d at 536; *Storybook Homes, Inc. v. Carlson,* 19 Ill.App.3d at 582, 312 N.E.2d at 29. In determining whether an ambiguity exists, as a matter of law, the trial court may consider parol and extrinsic evidence. *URS Corp. v. Ash,* 101 Ill.App.3d at 235, 56 Ill.Dec. at 754, 427 N.E.2d at 1300; *Keep Productions, Inc. v. Arlington Park Towers Hotel Corp.,* 49 Ill.App.3d at 263, 7 Ill.Dec. at 652, 364 N.E.2d at 943; *Baird & Warner v. Ruud,* 45 Ill.App.3d at 229, 3 Ill.Dec. at 891, 359 N.E.2d at 750. If the trial court determines that the contract in question contains no ambiguity, then no extrinsic or parol evidence is presented to the trier of fact. If, however, the court determines that an ambiguity is present in the contract, then the court may permit extrinsic and parol evidence to be introduced at trial, to allow the trier of fact to determine the intent of the parties in entering into the contract. *URS Corp. v. Ash,* 101 Ill.App.3d at 235, 56 Ill.Dec. at 754, 427 N.E.2d at 1300; *Keep Productions, Inc. v. Arlington Park Towers Hotel Corp.,* 49 Ill.App.3d at 263, 7 Ill.Dec. at 652, 364 N.E.2d at 943; *Baird & Warner v. Ruud,* 45 Ill.App.3d at 229, 3 Ill.Dec. at 891, 359 N.E.2d at 750. Accordingly, the holding in *Ortman,* and its progeny, that "relevant parol evidence is always admissible to assist in the determination of what the words used in an integrated writing mean" is not an accurate statement of Illinois law and therefore is overruled to that extent. *Cf. Chicago & N.W. Ry. Co. v. Chicago, M., St. P. & P.R. Co.,* 502 F.2d 193, 195 n. 3 (7th Cir.1974) (under the Seventh Circuit's interpretation of Illinois law, it appears that the scope of examination of extrinsic evidence in contract disputes is considerably greater than traditionally recognized). Rather, more recent Illinois decisional law clearly provides that when interpreting a contract, parol and extrinsic evidence is only admissible at trial, for consideration by the trier of fact, if the trial court determines, as a matter of law, that the contract is ambiguous. In determining the issue of ambiguity, as a matter of law, the trial court may consider parol and extrinsic evidence. *Accord URS Corp. v. Ash,* 101 Ill.App.3d at 235, 56 Ill.Dec. at 754, 427 N.E.2d at 1300; *Keep Productions, Inc. v. Arlington Park Towers Hotel Corp.,* 49 Ill.App.3d at 263, 7 Ill.Dec. at 652, 364 N.E.2d at 943; *Baird & Warner v. Ruud,* 45 Ill.App.3d at 229, 3 Ill.Dec. at 891, 359 N.E.2d at 750.

In the instant case, the Aircraft Lease Agreement provides in section 1(a), that " 'Aircraft' as used herein shall mean that certain Falcon 20 jet airplane, serial number 221, F.A.A. registration number N 300 NL, including the airframe (as hereinafter defined), the General Electric engines (as hereinafter defined) . . . ." Section 1(c) of the contract provides that " 'Engine' as used herein shall mean the two General Electric CF 700 engines presently installed on the Airframe . . . *or engines which may be substituted therefore as hereinafter provided.*" (emphasis added). The contract contains no provision setting forth the procedure to follow when substituting an engine. Thus, under the terms of the contract any reference to "aircraft" is uncertain because it could mean the airframe and the original engines or the airframe and substituted engines. Furthermore, section 8(a) of the contract requires IASCO to keep the aircraft "fully qualified at all times for United States operation under [its] FAR 135 certificate," but section 16(c) of the contract provides that IASCO "shall have no obligation to overhaul the Airframe or Engines prior to return of the Aircraft hereunder." According to this language, an obvious conflict would arise for IASCO if an overhaul of the airframe and/or the engines were required by IASCO's FAR 135 certificate during the term of the lease, but IASCO had no duty to overhaul the airframe or engines prior to its return of the aircraft to Sunstream. These sections of the Aircraft Lease Agree-

ment, along with the definitions of "aircraft" and "engines," reveal that certain terms of the contract are inconsistent, indefinite, and capable of more than one meaning.

In *Advertising Checking Bureau, Inc. v. Canal-Randolph Assoc.*, the Appellate Court of Illinois stated that "[a]n ambiguous contract is one capable of being understood in more senses than one; an agreement obscure in meaning, through indefiniteness of expression, or having a double meaning." 101 Ill.App.3d at 143–44, 56 Ill.Dec. at 637, 427 N.E.2d at 1042 (quoting *First National Bank v. Victor Comptometer Corp.*, 123 Ill.App.2d 335, 341, 260 N.E.2d 99, 102 (1970)). *See also Joseph v. Lake Michigan Mortg. Co.*, 106 Ill.App.3d at 991, 62 Ill.Dec. at 639, 436 N.E.2d at 665; *National Tea Co. v. American National Bank and Trust*, 100 Ill.App.3d at 1049, 56 Ill.Dec. at 477, 427 N.E.2d at 808; *Terracom Dev. Group v. Coleman Cable & Wire*, 50 Ill.App.3d at 744, 8 Ill.Dec. at 645, 365 N.E.2d at 1031; *Gardiakos v. Vanguard Communications, Inc.*, 38 Ill. App.3d at 940, 350 N.E.2d at 212. Illinois courts have further described an ambiguous contract as one in which the language "is reasonably and fairly susceptible of more than one meaning." *Lenzi v. Morkin*, 116 Ill.App.3d at 1015, 72 Ill.Dec. at 416, 452 N.E.2d at 669; *Hartwig Transit, Inc. v. Menalascino*, 113 Ill.App.3d 165, 168, 68 Ill.Dec. 796, 799, 446 N.E.2d 1193, 1196 (1983); *In re Maxwell*, 30 B.R. 982, 986 (Bkrtcy.N.D.Ill.1983); *Great Atlantic & Pacific Tea Co. v. La Salle National Bank*, 77 Ill.App.3d at 483, 32 Ill.Dec. at 816, 395 N.E.2d at 1197 (1979); *See also Felbinger and Co. v. Traiforos*, 76 Ill. App.3d at 732, 31 Ill.Dec. at 911, 394 N.E.2d at 1288 (term susceptible of two meanings is ambiguous). In the instant case, the language of the Aircraft Lease Agreement reveals that the term engine is reasonably susceptible of more than one meaning and that IASCO's duty to overhaul the airframe and engines is, at best, indefinite. Accordingly, we hold that under Illinois law, the Aircraft Lease Agreement is ambiguous, as a matter of law,[7] and the district court properly admitted extrinsic and parol evidence to allow the trier of fact to resolve the ambiguity and determine the parties' intent in entering into the contract.[8]

## B. JURY INTERPRETATION OF THE LEASE

Sunstream next contends that the district court erred by allowing the jury to "determine the meaning and effect of the contract terms and glean the intent of the parties." The general law in Illinois with regard to the interpretation and construction of contracts is set forth in *National Tea Co. v. Commerce and Industry Insurance Co.*, 119 Ill.App.3d 195, 74 Ill.Dec. 704, 456 N.E.2d 206 (1983):

---

7. The trial court did not make an express finding of ambiguity in this case, however, as previously noted, the question of ambiguity is one of law and thus can be determined by this court. In the instant case, we have determined, as a matter of law, that the Aircraft Lease Agreement is ambiguous on its face.

8. Sunstream further claims that if extrinsic and parol evidence was admissible at trial, the scope of the evidence was improper because parties to the Aircraft Lease Agreement were discussing prior negotiations and interpreting lease terms. Under Illinois law, once it is determined that extrinsic and parol evidence is admissible, any relevant evidence is admissible to explain the negotiations between the parties, *Dixie Square Thom McAn v. Dixie Square Mgm't*, 55 Ill. App.3d 619, 624, 13 Ill.Dec. 229, 232, 370 N.E.2d 1256, 1259 (1977); *Keep Productions Inc. v. Ar-*

*lington Park Towers Hotel Corp.*, 49 Ill.App.3d at 263, 364 N.E.2d at 943; the meaning of certain "words of art," *Siegal v. Health Care Service Corp.*, 81 Ill.App.3d 784, 792, 36 Ill.Dec. 899, 905, 401 N.E.2d 1037, 1043 (1980); and the custom of the industry, *Ruthman v. Guarantee Insurance Agency Co.*, 89 Ill.App.3d 997, 999, 45 Ill.Dec. 346, 347, 412 N.E.2d 697, 698 (1980). Thus, it was proper for executives and attorneys for both IASCO and Sunstream to discuss the preliminary negotiations of the Aircraft Lease Agreement, certain terms used in the lease, and the custom of the aircraft industry. *See, e.g., Bard v. Harvey*, 74 Ill.App.3d at 19–20, 29 Ill. Dec. at 817, 392 N.E.2d at 374; *Edgewater Hospital, Inc. v. Bio-Analytical Services*, 57 Ill. App.3d 632, 636–37, 15 Ill.Dec. 109, 111, 373 N.E.2d 455, 457 (1978).

"[T]he interpretation, construction or legal effect of a contract is a matter to be determined by the court as a question of law.... This rule has been applied (1) where the contract is in writing ...; (2) *where there is no ambiguity or uncertainty in the terms of the contract ...; and (3) where there is no question involving proof of the parties' construction which is dependent upon disputed extrinsic facts.*" 119 Ill.App.3d at 200, 74 Ill.Dec. at 708, 456 N.E.2d at 210 (emphasis added) (quoting *Sherbrooke Homes Company v. Krawczyk*, 82 Ill.App.3d 990, 992, 38 Ill. Dec. 391, 392, 393, 403 N.E.2d 622, 623–24 (1980)). The court went on to state *"only if the contract is ambiguous and the extrinsic facts necessary to determine the parties' interpretation thereof are in controversy should the question of interpretation be left to the jury."* 119 Ill.App.3d at 200, 74 Ill.Dec. at 708, 456 N.E.2d at 210 (emphasis added); *Sherbrooke Homes v. Krawczyk*, 82 Ill.App.3d at 992, 38 Ill.Dec. at 393, 403 N.E.2d at 624. Thus, under Illinois law, "if the extrinsic facts and circumstances are controverted or if the meaning of the contract is uncertain in light of the extrinsic evidence, then the intent of the parties to the contract must be determined as a question of fact by the jury...." *Nerone v. Boehler*, 34 Ill. App.3d at 891, 340 N.E.2d at 537. *See also De Lathouwer v. Kewanee Boiler Corp.*, 94 Ill.App.3d at 807, 50 Ill.Dec. at 584, 419 N.E.2d at 692; *Lichtenstein v. Anvan Co.*, 62 Ill.App.3d at 96, 19 Ill.Dec. at 300, 378 N.E.2d at 1175.

██ This court has already established, as a matter of law, that the Aircraft Lease Agreement is ambiguous on its face. Furthermore, the extrinsic evidence introduced at trial to resolve this ambiguity was clearly in dispute. Sunstream introduced evidence and elicited testimony to show that, under the terms of the contract, IASCO had to obtain written consent from Sunstream before removing the original engines from the airframe. IASCO, on the other hand, introduced evidence and elicited testimony to show that, under the terms of the contract, it was permitted to remove the original engines from the airframe at any time, in order to keep the "Falcon 20–D" aircraft airworthy and in compliance with Federal regulations. In light of the facts that the Aircraft Lease Agreement was ambiguous on its face and the extrinsic evidence introduced at trial to explain such ambiguity was in dispute, we hold that the district court properly allowed the jury, as the trier of fact, to consider the controverted extrinsic evidence and determine the parties' intent in entering into the contract." [9]

## C. AMENDING THE COMPLAINT

██ Sunstream next contends that the district court erred by denying Sunstream's request to amend its complaint to conform the pleadings to the evidence presented at trial. After all the evidence had been submitted to the jury, Sunstream motioned the court to strike subparagraphs B and C of the amended complaint which provided:

"B. That the Defendant be ordered to return the original engines, numbers 299–065 and 299–110, presently stored in the State of Kansas, to plaintiff in West Chicago, Illinois.

C. That said substituted engines, numbers 299–G–128 and 299–H–118, be found to be 'replacements' or 'substitutions' and 'accessions' to said aircraft under the terms of said Lease, and that 'title' to said substituted engines be in Plaintiff and that Defendant be ordered to deliver said aircraft, with said substi-

---

9. Sunstream further claims that the district court erred by not accepting its jury instruction on the proper interpretation of the contract. This claim is without merit as the judge instructed the jury on the "plaintiff's theory of the case" and the jury heard considerable testimony from both IASCO and Sunstream concerning their respective interpretations of the contract. *See United States v. Ray*, 683 F.2d 1116, 1127 (7th Cir.), *cert. denied*, 459 U.S. 1091, 103 S.Ct. 578, 74 L.Ed.2d 938 (1982) (as long as jury instructions treat the issues fairly and adequately, they will not be interfered with on appeal).

tuted engines, to Plaintiff at the termination of said Lease on May 31, 1981." Sunstream claimed that there was no evidence introduced at trial on the issue of who was to receive the original and substitute engines, thus that portion of the complaint should have been stricken to conform the pleadings to the evidence. By deleting subparagraphs B and C, Sunstream wanted the jury to only consider whether Sunstream was entitled to the "fair reasonable market value" of an overhaul for the original engines and the "fair reasonable market value" of the substitute engines.

We initially note that Sunstream characterizes its attempt to delete a portion of the complaint, after all the evidence had been submitted at trial, as an amendment of the pleadings under Fed.R.Civ.P. 15(b).[10] The court in *Holley v. Outboard Marine Corp.,* 241 F.Supp. 657 (N.D.Ill.1964), *aff'd* 345 F.2d 351 (7th Cir.1965), *cert. denied,* 383 U.S. 934, 86 S.Ct. 1062, 15 L.Ed.2d 851 (1966), was presented with a similar situation when the defendant sought to delete portions of its answer, at the close of its case, to conform the answer with evidence presented during trial. The court stated:

"Defendant's motion to delete a number of defensively-pleaded patents is somewhat unique. *Normally, of course, amendments serve the purpose of adding affirmative positions. No suggestion is made as to the purpose to be served by the allowance of the motion save for the intimation that pleadings not supported by proof should or must be stricken."*

241 F.Supp. at 669 (emphasis added). We agree that the most common reason for amending a complaint after the evidence has been presented at trial is to *add* issues and thereby conform the pleadings to the evidence. Indeed, only on a rare occasion would a plaintiff fail to introduce any evidence in support of his requested relief, and then wait until all the evidence had been submitted before moving to delete the requested relief from the complaint to conform the pleadings to the evidence.[11]

In the instant case, the trial record reveals that Sunstream introduced considerable evidence concerning its right to receive the two original engines (serial numbers 299065, 299110) and the two substituted engines (serial numbers 299G128, 299H118), as accretions to the "Falcon 20-D" aircraft. In his opening statement, counsel for Sunstream claimed that "the evidence will show ... that if you take ... engines off and you put some other engines on, we own every one of them." During trial, Sunstream presented evidence that it owned the two original engines, and elicited testimony on cross-examination that the two substitute engines were accessions to the aircraft, with title vested in Sunstream. Furthermore, in response to

---

**10.** Fed.R.Civ.P. 15(b) provides:

"When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues. If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice him in maintaining his action or defense upon the merits. The court may grant a continuance to enable the objecting party to meet such evidence."

**11.** The deletion of a portion of a complaint has been recognized as an amendment to the pleadings for purposes of Fed.R.Civ.P. 15(a), which governs amendments to the pleadings not amendments that conform the pleadings to the evidence. At least one commentator has interpreted Fed.R.Civ.P. 15(a) to mean that "amendments effecting dismissal of less than all claims by plaintiff should ... be governed by Rule 15." 5 J. Moore, J. Lucas, & J. Wicker, *Moore's Federal Practice* ¶¶ 15.07[3], 41.06–1 (2nd ed. 1982). *See also Smith, Kline & French Laboratories v. A.H. Robins Co.,* 61 F.R.D. 24 (E.D.Pa.1973). In the instant case, however, Sunstream seeks not to amend its complaint under Fed.R.Civ.P. 15(a), but to amend its complaint after trial, under Fed.R.Civ.P. 15(b), in order to conform the pleadings to the evidence.

the court's inquiry, "[a]re you making a claim that you own all four engines," Sunstream responded, "yes." It is well-settled that "[i]n determining whether to permit an amendment under Fed.R.Civ.P. 15(b), the district court has broad discretion and will not be reversed except upon a showing of abuse." *Nielson v. Armstrong Rubber Co.*, 570 F.2d 272, 276 (8th Cir.1978). *See also Herrera v. Valentine*, 653 F.2d 1220, 1223 (8th Cir.1981); 6 C. Wright & A. Miller, *Federal Practice and Procedure* § 1493 at 469 (1971). In light of the evidence introduced by Sunstream that it owned all four engines, the request to delete subparagraphs B and C of the amended complaint would have actually been contrary to the evidence and thus would not have conformed the pleadings to the evidence. Accordingly we hold that the district court did not abuse its discretion in denying Sunstream's request to delete subparagraphs B and C from its complaint at the close of all the evidence.

## D. AWARD OF ATTORNEY'S FEES

■ Sunstream finally contends that the district court was without jurisdiction to award costs, expenses, and attorney's fees in this case. The record reveals that on September 22, 1982, the district court denied IASCO's motion for costs, expenses, and attorney's fees, and on that same day IASCO filed a motion for reconsideration. Two days later, on September 24, 1982, Sunstream filed a notice of appeal in this court. The district court, upon reconsideration, awarded IASCO costs, expenses, and

attorney's fees on November 30, 1982. Sunstream claims that at the time it filed the notice of appeal in this court, the district court was divested of jurisdiction and thus could not reconsider the motion for attorney's fees.

We hold Sunstream's argument to be without merit, as the record clearly reveals that on November 2, 1982, this court dismissed Sunstream's original appeal, pursuant to Fed.R.App.P. 4(a)(4).[12] This court stated that:

"Because there is currently pending in the district court a motion to alter or amend a judgment, a notice of appeal filed before the disposition of such motion shall have no effect. Federal Rule of Appellate Procedure 4(a)(4). Following entry by the district court of an order disposing of a motion to reconsider, a new notice of appeal, of desired, must be filed."

Thus, under Fed.R.App.P. 4(a)(4), Sunstream's original appeal "had no effect" and the district court retained jurisdiction to reconsider IASCO's motion for costs, expenses, and attorney's fees, and grant the same.

■ Sunstream further contends that this court can only dismiss a pending appeal under Fed.R.App.P. 4(a)(4), if a timely motion was filed under Fed.R.Civ.P. 50(b), 52(b), or 59, in the district court. Sunstream claims that IASCO's motion to reconsider the denial of attorney's fees was a motion filed under Fed.R.Civ.P. 60(b)(6) and thus did not fall within the language of Fed.R.App.P. 4(a)(4).[13] We again hold Sun-

---

12. Fed.R.App.P. 4(a)(4) provides:

"If a timely motion under the Federal Rules of Civil Procedure is filed in the district court by any party: (i) for judgment under Rule 50(b); (ii) under Rule 52(b) to amend or make additional findings of fact, whether or not an alteration of the judgment would be required if the motion is granted; (iii) under Rule 59 to alter or amend the judgment, or (iv) under Rule 59 for a new trial, the time for appeal for all parties shall run from the entry of the order denying a new trial or granting or denying any other such motion. Notice of appeal filed before the disposition of any of the above motions shall have no effect. A new notice of appeal must be filed within the

prescribed time measured from the entry of the order disposing of the motion as provided above. No additional fees shall be required for such filing."

13. Fed.R.Civ.P. 60(b) provides, in pertinent part:

"On motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepre-

stream's claim to be without merit, for as this court stated in *Bank of California v. Arthur Andersen & Co.*, 709 F.2d 1174 (7th Cir.1983), "substance controls in determining whether a post judgment motion is a Rule 59(e) or a Rule 60 motion." 709 F.2d at 1176. *See also Western Industries, Inc. v. Newcor Canada Limited*, 709 F.2d 16, 17 (7th Cir.1983) (per curiam); *A.D. Weiss Lithograph v. Illinois Adhesive Products*, 705 F.2d 249, 250 (7th Cir. 1983) (per curiam); *United States Labor Party v. Oremus*, 619 F.2d 683, 687 (7th Cir.1980). In accord with the language of Fed.R.Civ.P. 59(e), IASCO's motion for reconsideration asked the court to "*amend* its judgment entered September 22, 1982." (emphasis added). Furthermore, the record clearly reveals that IASCO filed its motion for reconsideration on the same day the district court denied the motion for costs, expenses, and attorney's fees, and thus satisfied the timely filing requirement of Fed. R.App.P. 4(a)(4). Accordingly, this court properly dismissed Sunstream's first appeal, under Fed.R.App.P. 4(a)(4), while the motion to reconsider costs, expenses, and attorney's fees was still pending in the district court.

### III

We affirm the judgment of the district court.

sentation, or other misconduct of an adverse party; (4) the judgment is void; (5) the judgment has been satisfied, released or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment."